Deepak Gupta (*pro hac vice*)
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

Neil K. Sawhney (State Bar No. 300130)
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

*Attorneys for Plaintiff Miyoko's Kitchen*

Alene Anello (State Bar No. 316387)
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
*aanello@aldf.org*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| MIYOKO'S KITCHEN,<br><br>　　　　　*Plaintiff,*<br><br>v.<br><br>KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and STEPHEN BEAM, in his official capacity as Branch Chief of the Milk and Dairy Food Safety Branch,<br><br>　　　　　*Defendants.* | Case No. 3:20-cv-00893-RS<br><br>Hon. Richard Seeborg<br><br>Date:　　　July 2, 2020[1]<br>Time:　　　1:30pm<br>Courtroom:　3 |

**MEMORANDUM OF LAW IN SUPPORT OF MIYOKO'S KITCHEN'S
MOTION FOR PRELIMINARY INJUNCTION**

---

[1] This motion is noticed motion under Northern District of California Local Rule 7-2, with the hearing automatically vacated pursuant to Northern District of California General Order 72-3.

# TABLE OF CONTENTS

Table of authorities.................................................................................................. ii

Introduction............................................................................................................. 1

Background.............................................................................................................. 3

    1.    Miyoko's, a pioneer in the plant-based dairy industry, popularizes vegan butter and vegan cheeses........................................................ 3

    2.    The popularity of plant-based dairy products threatens the conventional animal dairy industry. ................................................. 4

    3.    The State requires that Miyoko's censor truthful statements from its product labeling and marketing, and threatens further adverse action........... 5

    4.    As a result of being targeted by the State, Miyoko's has been forced to restrict its speech and consider costly changes to its product labeling, marketing, and business practices—all of which will increase customer confusion....................................................................................... 8

Argument............................................................................................................... 11

    I.    Miyoko's First Amendment claim is likely to succeed. ............................... 11

        A.    The State shoulders a heavy burden to prove that its restrictions on Miyoko's commercial speech satisfy heightened scrutiny. ...................................................................... 11

        B.    Miyoko's truthful and accurate descriptions of its plant-based dairy products are not misleading. ............................. 13

        C.    The State cannot satisfy the remaining *Central Hudson* factors........... 18

    II.    Miyoko's is already suffering—and will continue to suffer—irreparable harm without preliminary injunctive relief.................................. 21

    III.    The balance of the equities and the public interest weigh in favor of a preliminary injunction. .................................................. 23

Conclusion............................................................................................................. 24

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*44 Liquormart Inc., v. Rhode Island,*
    517 U.S. 484 (1996)..................................................................................................... 18

4

5

*Alliance of Automobile Manufacturers. v. Hull,*
    137 F. Supp. 2d 1165 (D. Ariz. 2001) .................................................................. 21

6

*American Beverage Association v. City & County of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) .................................................................................... 24

7

8

*Ang v. Whitewave Foods Co.,*
    2013 WL 6492353 (N.D. Cal. Dec. 10, 2013).............................................. 2, 14, 16

9

10

*Animal Legal Defense Fund v. Wasden,*
    878 F.3d 1184 (9th Cir. 2018) ............................................................................. 3, 19

11

*Bates v. State Bar of Arizona,*
    433 U.S. 350 (1977) .................................................................................................... 19

12

13

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008)......................................................................... 13, 17, 18

14

15

*Bloom v. O'Brien,*
    841 F. Supp. 277 (D. Minn. 1993)........................................................................... 13

16

17

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*
    447 U.S. 557 (1980) ........................................................................................ 11, 13, 18

18

*CTIA - The Wireless Association v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019)............................................................................... 12, 21

19

20

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019) .......................................................................... 3, 11, 21

21

22

*Doe v. Harris,*
    772 F.3d 563 (9th Cir. 2014) .................................................................................... 23

23

24

*Edenfield v. Fane,*
    507 U.S. 761 (1993)............................................................................................... 12, 19

25

*Elrod v. Burns,*
    427 U.S. 347 (1976).................................................................................................... 21

26

27

*Federal Communications Commission v. Pacifica Foundation,*
    438 U.S. 726 (1978) ................................................................................................... 21

28

*First National Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978) ...............................................................................................................3

*Gitson v. Trader Joe's Co.*,
  2015 WL 9121232 (N.D. Cal. Dec. 1, 2015)...................................................................... 14

*Ibanez v. Florida Department of Business & Professional Regulation, Board of Accountancy*,
  512 U.S. 136 (1994) ...................................................................................................12, 18

*International Dairy Foods v. Boggs*,
  622 F.3d 628 (6th Cir. 2010).....................................................................................15, 18

*Italian Colors Restaurant v. Becerra*
  878 F.3d 1165 (9th Cir. 2018)................................................................................... 2, 12

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ...........................................................................................23

*Madison Joint School Disrict. No. 8 v. Wisconsin Employment Relations Commission*,
  429 U.S. 167 (1976) ..........................................................................................................21

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) .......................................................................................................12

*Novartis Consumer Health, Inc. v. Johnson & Johnson*,
  290 F.3d 578 (3d Cir. 2002) ............................................................................................. 22

*Ocheesee Creamery LLC v. Putnam*,
  851 F.3d 1228 (11th Cir. 2017)....................................................................... 2, 15, 16, 18

*Painter v. Blue Diamond Growers*,
  2017 WL 4766510 2017 (C.D. Cal. May 24, 2017) ......................................................15

*Painter v. Blue Diamond Growers*,
  757 F. App'x 517 (9th Cir. 2018) .....................................................................................15

*Pearson v. Shalala*,
  164 F.3d 650 (D.C. Cir. 1999) ......................................................................................... 19

*Rosenberger v. Rector and Visitors of the University of Virginia*,
  515 U.S. 819 (1995) ........................................................................................................3, 11

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995).............................................................................................................13

*Safelite Group, Inc. v. Rothman*,
  229 F. Supp. 3d 859 (D. Minn. 2017) ............................................................................20

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................................................. 2, 11, 12

iii

*Stuhlbarg International Sales v. John D. Brush,*
    240 F.3d 832 (9th Cir. 2001) ................................................ 22

*Thompson v. West States Medical Center,*
    535 U.S. 357 (2002) ..................................................................12

*Turtle Island Foods SPC v. Soman,*
    424 F. Supp. 3d 552 (E.D. Ark. 2019) ...............................*passim*

*Valle Del Sol Inc. v. Whiting,*
    709 F.3d 808 (9th Cir. 2013) ................................................ 24

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ..................................................................12

*White v. City of Sparks,*
    500 F.3d 953 (9th Cir. 2007) .................................................17

*Winter v. Natutral Resource Defense Council, Inc.,*
    555 U.S. 7 (2008) .................................................................... 11

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
    471 U.S. 626 (1985) ................................................................ 18

**Statutes and Regulations**

21 U.S.C. § 321a .............................................................................. 16

21 C.F.R. § 102.5(a) ......................................................................... 16

21 C.F.R. § 150.110 .......................................................................... 16

21 C.F.R. § 164.150 .......................................................................... 16

California Food & Agricultural Code § 32765 ...............................7

California Food and Agricultural Code § 35281 ...........................7

**Other Authorities**

David C. Vladeck, *Lessons from A Story Untold:* Nike v. Kasky *Reconsidered,*
    54 Case W. Res. L. Rev. 1049 (2004) ..................................20

Merriam-Webster Online, https://www.merriam-webster.com/dictionary/butter ................ 16

Taimie L. Bryant, *Social Psychology and the Value of Vegan Business Representation for Animal Law Reform,* 2015 Mich. St. L. Rev. 1521 (2015) ................................23

# INTRODUCTION

Miyoko's Kitchen is a pioneer in the rapidly growing plant-based dairy industry. Founded in the Bay Area by a longtime advocate for vegan and plant-based diets, Miyoko's has brought 100% plant-based vegan butter and cheeses to consumers throughout California and nationwide. The company's target market is consumers who wish to avoid eating dairy products made from animals. Many of these customers choose Miyoko's specifically because they identify with the company's mission—to contribute to a "more sustainable, more compassionate food system that honors the rights of all living beings." Declaration of Miyoko Schinner ¶ 2. For this reason, all of Miyoko's labeling unmistakably conveys to consumers that its products are "vegan" and "made from plants." Likewise, all of its marketing—from its website to advertising—describes its products as "100% dairy and cruelty free" and encourages a plant-based, "phenomenally vegan" diet.

The State of California has now targeted Miyoko's precisely for this truthful and accurate speech. In a recent letter, the Milk and Dairy Food Safety Branch of the Department of Food and Agriculture warns Miyoko's that it may not legally use the word "butter" in the name of its "Cultured Vegan Plant Butter" product, and demands that the company remove claims that its vegan products are "100% cruelty and animal free," "cruelty free," "lactose free," and "revolutionizing dairy with plants"—all truthful statements. The State's letter even orders Miyoko's to "remov[e]" an "image of a woman hugging a cow" (and other images "associating the product with such activity") from the company's website.

The State's enforcement stance has chilled Miyoko's speech, and the company now operates under a cloud of fear that the State will take further action against it. That fear is reasonable: As the State has explained to this Court, the Department "follows a policy of escalating notifications of enforcement." ECF 17-2 at 3. The very next step in this process is a letter "that threatens to impound the product," which may be followed by even more "coercive" penalties. ECF 17-1 at 8. Miyoko's therefore has had to consider changing its labeling and marketing for its entire line of products—a task that will cost millions of dollars and require substantial time and effort. Even worse, the changes the State has demanded will make it more difficult for Miyoko's to truthfully and accurately convey the nature of its products and its mission to the public. Moving

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

forward, Miyoko's must either censor its own speech or risk significant penalties and customer confusion. As Miyoko's founder explains: "[W]e now have to ask ourselves: Is the State going to consider this 100% truthful message about our 100%-plant-based products illegal and order us to alter our message? And, if so, is it worth the risk to us? Should we censor ourselves in advance? Or should we continue to tell our customers the truth about our products?" Schinner Decl. ¶ 15.

The State's attempted censorship of Miyoko's speech violates the First Amendment. Any such speech restriction is subject to "heightened scrutiny," and the State's "burden under this test is 'heavy.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018). The State cannot shoulder that burden here. It cannot plausibly argue that Miyoko's truthful and accurate descriptions of its vegan products are misleading or deceptive to consumers. Numerous courts, including this Court and the Ninth Circuit, have concluded that such a claim "stretches the bounds of credulity." *Ang v. Whitewave Foods Co.*, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013). "[I]t is simply implausible that a reasonable consumer would mistake a product like soymilk or almond milk with dairy milk from a cow." *Id.* Under that logic, "a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper." *Id.*

Nor can the State show that its targeting of Miyoko's directly and narrowly advances a substantial governmental interest, given the "numerous less burdensome alternatives" short of "banning the term[s]" to which the State objects. *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1240 (11th Cir. 2017) (rejecting Florida's attempt to restrict use of truthful terminology on milk labels). If it were really concerned about consumer confusion, for example, "the State could require more prominent disclosures of the vegan nature of plant-based products." *Turtle Island Foods SPC v. Soman*, 424 F. Supp. 3d 552, 576 (E.D. Ark. 2019) (rejecting Arkansas' attempt to restrict truthful use of terms like "meat" and "burger" in connection with plant-based products).

The State's inability to identify *any* permissible interest that is actually served by its censorship "gives rise to suspicion" that it is motivated by "an impermissible purpose": "protect[ing] members of the agricultural industry." *Animal Legal Defense Fund v. Wasden*, 878 F.3d

1184, 1198 (9th Cir. 2018). Faced with growing consumer demand for plant-based alternatives, conventional meat and dairy producers increasingly view plant-based foods as a threat. Their lobbyists have responded by pressuring legislators and regulators (including California's) to censor the speech of plant-based producers. Milk is California's number one agricultural product, and the State's Milk and Dairy Food Safety Branch promotes and protects the conventional dairy industry. In censoring Miyoko's speech, the Branch has taken sides in a national debate between proponents of plant-based and animal-based foods. The State's targeting of Miyoko's and other plant-based producers, in other words, is an "attempt to give one side" in this public debate "an advantage in expressing its views to the people." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978). But the Constitution prohibits the State from putting it thumb on the scales—when the "government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of the University of Va.*, 515 U.S. 819, 829 (1995).

Miyoko's speech—its expression of its core mission to "revolutionize dairy with plants," its proud declaration that its products are "100% cruelty and animal free," and its display of an image of a woman hugging a cow—is fully protected by the First Amendment. "In situations where the plaintiff's First Amendment rights [are] being chilled daily," the Ninth Circuit has explained, "the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance." *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019). Because that is true here, the Court should preliminarily enjoin the State of California from taking action against Miyoko's for expressing truthful and accurate information about its products.

## BACKGROUND

### 1. Miyoko's, a pioneer in the plant-based dairy industry, popularizes vegan butter and vegan cheeses.

Miyoko's is one of the nation's leading producers of plant-based butter and cheeses. The company was founded by Miyoko Schinner, a long-time vegan and activist who has spent more than 30 years working to increase the availability and popularity of plant-based foods in America. Schinner Decl. ¶ 2. After publishing a cookbook on artisan vegan cheese in 2012, Ms. Schinner realized that there was consumer demand for plant-based dairy products. *Id.* ¶ 4. So she started

Miyoko's to not only bring "delicious, artisanal plant-based cheese and butter to the market," but also to help develop "a new food system and economy that are not based on animal agriculture" in order "to ensure a planet that will continue to serve us." *Id.* ¶¶ 2, 4, 8.

Using natural processes such as fermentation and aging, Miyoko's produces a number of different vegan cheeses, cultured vegan butter, and vegan cream cheese. Schinner Decl. ¶ 5. The majority of these products are made by combining traditional cheese-making cultures with plant-based foods like cashew nuts, oats, and legumes. *Id.* All of these products are prominently labeled as "vegan" and "plant-based." *Id.* ¶ 6. These qualifiers align with guidance from industry groups, like the Plant Based Foods Association, about how to label products in a way that is consistent and clear for consumers. Simon Decl. ¶ 5.

Likewise, the company's website and marketing materials emphasize that the company's mission is "Phenomenally Vegan" and urge people to adopt a plant-based diet. *Id.* The company "has a passionate following because consumers have a connection to [its] mission of 'revolutionizing dairy with plants.'" Cohen Decl. ¶ 2.  Because the company's target market is people who want to avoid dairy made from animals, Miyoko's needs its labels and marketing to make clear to customers that its products are vegan and plant-based. *Id.*; Allsopp Decl. ¶¶ 3–4, 7.

Miyoko's has experienced significant growth since its founding in 2014. Although Ms. Schinner started the company with just four employees in her home kitchen, Miyoko's now sells its products in 12,000 stores nationwide and in Canada, including major grocery chains. Schinner Decl. ¶ 7. Despite Miyoko's success, the company also remains committed to its broader mission— to "contribute to the creation of a humane, healthy, and sustainable food supply" and to "play a major role in ending animal cruelty and reducing climate change caused by animal agriculture." *Id.* ¶ 8. "This ethos is inextricable to [the company's] brand." Cohen Decl. ¶ 2.

**2.** **The popularity of plant-based dairy products threatens the conventional animal-dairy industry.**

Although Miyoko's is one of the leaders in the plant-based dairy industry, it is not the only company that has experienced success and growth. Retail sales of plant-based foods have

skyrocketed in recent years, growing 11% just last year and 31% since early 2017. Simon Decl. ¶ 6. Among the "leading drivers of plant-based sales" are plant-based milks and dairy alternatives, which are expected to reach $40 billion in annual sales by 2025. *Id.* At the same time that plant-based dairy sales are booming, however, sales of traditional animal-dairy products have been decreasing. *See id.*

The conventional dairy industry apparently believes that the decline in demand for animal-based dairy is linked to the growing popularity of plant-based dairy, and has taken steps to ward off what it views as a threat. For example, the National Milk Producers Federation has petitioned the FDA for almost 20 years to prevent plant-based dairy alternatives from using dairy terminology to describe their products. *See* Exs. A, B & C to Sawhney Decl. And these lobbying efforts are not limited to plant-based *dairy*. In February 2018, to take another example, the United States Cattlemen's Association petitioned the USDA to prevent plant-based alternatives to meat from using the terms "beef" and "meat." Ex. D. to Sawhney Decl.

These efforts have largely failed at the federal level, and the FDA has not taken the regulatory actions that the conventional dairy industry requested. But the animal-based dairy industry has also turned to state regulators, including California's Milk and Dairy Food Safety Branch, part of the Department of Food and Agriculture. The animal-based dairy industry has particular influence in California—the largest producer of cow milk of all 50 states. For the last several years, the National Milk Producers Federation has written to the Branch to complain about vegan products using "dairy terminology"—even though they are clearly labeled with plant-based terms like "almond milk yogurt" and "cashew milk." *See* Ex. E to Sawhney Decl.; *see also* Simon Decl. ¶ 11; Allsopp Decl. ¶ 7.

**3.    *The State requires that Miyoko's censor truthful statements from its product labeling and marketing, and threatens further adverse action.***

On December 9, 2019, Miyoko's received a letter from the Milk and Dairy Food Safety Branch of California's Department of Food and Agriculture, requiring the company to make

immediate changes to its product labeling, website, and marketing materials to come into "compliance" with state and federal law. Schinner Decl. ¶ 10; Dept. Ltr. 1 (ECF 4-1).

Specifically, the letter contended that the company's Cultured Vegan Plant Butter product "cannot bear the name 'Butter' because the product is not butter," and demanded that Miyoko's "[r]emove the word 'Butter' from the label." Dept. Ltr. 1. This is despite the fact that the label (shown in part below and attached to the Department's letter) prominently and repeatedly states that the butter is "Vegan," "Made from Plants," and "Phenomenally Vegan," and instructs customers to "use 1:1 to replace conventional dairy butter." *See Id.* at 3–4. In addition, the letter required Miyoko's to remove phrases like "lactose free," "hormone free," "cruelty free," and "revolutionizing dairy with plants" from its vegan butter product label. Schinner Decl. ¶ 10; Dept. Ltr. 2. The Department did not dispute the veracity or accuracy of these claims, but claimed that Miyoko's could not express them because "the product is not a dairy product" and "fails to contain [] milk and milk ingredients." *Id.*



The Department also demanded that Miyoko's remove "[i]mages of animal agriculture from [its] website," including an image of a "woman hugging a cow with other cows grazing in the background" along with the text "100% dairy and cruelty free." Dept. Ltr. 1–2. The photograph targeted by the Department (shown below and attached to the Department's letter) is actually of a volunteer stroking the head of a rescued dairy cow, and was intended to show cows in a different

light from their typical depiction as food source. Schinner Decl. ¶ 10; *see* Dept. Ltr. 3. This specific demand caused the company's leadership particular "shock" and "concern," because they had recently decided to include a picture of "Miyoko hugging a cow that she had rescued from slaughter" on "all new product packages across all product lines" to encapsule "the kindness that she, and her company[,] represent." Cohen ¶¶ 4–5; Allsopp Decl. ¶ 4.



Miyoko's and its leadership understand the Department's letter to threaten adverse action if the company does not make the demanded changes to its product labeling, website, and other marketing materials. Schinner Decl. ¶¶ 11–12; Allsopp Decl. ¶¶ 2, 5, 11. The Department has the power to levy significant penalties on Miyoko's, including impoundment of its products and even criminal penalties. *See* Schinner Decl. ¶ 11; Simon Decl. ¶ 12; *see also* Cal. Food & Agr. Code § 32765 (giving Department power to "condemn any product of milk or cream or product resembling a milk product" if "mislabeled"); *id.* § 35281 (providing that any "violation" of statutes concerning milk products is a misdemeanor). As the Department itself has explained to this Court, "the Department follows a policy of escalating notifications of enforcement." ECF 17-2 at 2. The Department first sends "an initial notice letter"—like the one it sent to Miyoko's in December—with "requests for modifications" and a warning to the company "that failure to obtain approval and product registration is a violation of [state law] subject to enforcement by the Department." ECF 17-1 at 3; ECF 17-2 at 2. The Department's next step, "before coercive enforcement," is "a second letter that

threatens to impound the product." ECF 17-2 at 2; ECF 17-1 at 3. After that, the "Department sends a third letter repeating this threat," which "is hand-delivered to facilities in California." *Id.* "[A]fter all three notices and another 30 days," the Department "will serve impound notices and move forward with impounding products." ECF 17-2 at 3.

### 4.   *As a result of being targeted by the State, Miyoko's has been forced to restrict its speech and consider costly changes to its product labeling, marketing, and business practices—all of which will increase customer confusion.*

The Department's letter and legal position has caused Miyoko's significant, ongoing harm. Because of the letter, the company now "operates under a cloud" and "a constant fear of enforcement action." Schinner Decl. ¶ 1. And these fears are not limited to Miyoko's vegan-butter product; the company is "concerned that the State's enforcement position affects not only the specific labeling identified in the letter, but all of [its] 100% plant-based products, and therefore threatens [its] ability to convey [its] message across the board." *Id.* ¶ 14.

The State's letter has already chilled Miyoko's speech—the company has "essentially avoided saying anything new out of fear of further enforcement." Cohen Decl. ¶ 7. According to Neil Cohen, the company's Vice President of Marketing, "[a]s a direct result of receiving the Branch's letter, we've refrained from using certain words and images on marketing materials and packages out of fear that those words and images will trigger further enforcement action." *Id.* Miyoko's has had to remove a brand video for social media that sought to convey information about the company's mission and purpose out of "fear of being further targeted." *Id.* ¶ 9. To take another example, because the State demanded that Miyoko's stop truthfully describing its products as "lactose free," the company has refrained from making any claims that its products are "GMO-free" in our branding—even though that is true. *Id.* ¶ 8.

As to its existing product labels, Miyoko's has faced what Cohen has called a "nightmare." Cohen Decl. ¶ 5. After receiving the letter, the leadership "was immediately worried that we would have to re-do all of the new packaging and corresponding marketing." *Id.* ¶ 5. Absent relief from this Court, Miyoko's will either have to create specialized labels and marketing for the products it sells in California, or it will have to change all of its labels and marketing nationwide. Schinner

Decl. ¶16. This will not only be incredibly expensive for Miyoko's—it would cost around $2 million—but it will also require significant rebranding and design efforts by the company's small team. *Id.* In fact, since the company received the letter, the leadership team has had a number of meetings to deal with the fallout—Cohen "conservatively estimate[s] that the number of hours we've spent dealing with the fear and repercussions of the enforcement letter to be well in excess of 100 hours." Cohen Decl. ¶ 6. And complying with the Department's demands would force the company to discard thousands of dollars of packaging, thereby imposing an environmental burden directly contrary to the company's mission. Schinner Decl. ¶16.

Also of paramount concern to Miyoko's is that compliance with the Department's directive will prevent the company from accurately communicating to consumers the nature and contents of its products, as well as "what they stand for." Schinner Decl. ¶ 1. Shifting to the "new messaging and nomenclature" mandated by the state will likely cause "confusion among consumers." *Id.* ¶ 16. Miyoko's cannot accurately and effectively describe its products without comparison to the conventional dairy products they are designed to replace. As the company's branding director explains: "Our inability to convey what a product is through words like 'cultured vegan butter,' 'cultured vegan mozz,' and 'plant-based dairy' . . . would leave consumers baffled as to our product's taste and function." Allsopp Decl. ¶ 3. "Something like 'cultured nut spread' would be meaningless to consumers, whereas they know exactly how to use 'cultured vegan butter.'" *Id.*

Miyoko's has in fact had this experience. Early in the company's history, the company took the word "cheese" off its packaging and instead called the products "cultured nut products." Schinner Decl. ¶ 16. The product was not popular because consumers didn't understand the nature of the product. But when the company "started to call [its] products 'vegan cheese' and 'vegan butter' . . . the public finally understood." *Id.* This experience is also supported by empirical studies. Recent academic research submitted to the FDA found that consumers were not confused about the nutritional differences between animal and plant-based milk and cheese products. *See* Ex. F to Sawhney Decl. In particular, research found that consumers were "generally accurate at identifying nutritional differences between plant-based and animal-based milk and cheese products." *Id.* at 2.

And it found no confusion on the part of consumers about differences between animal and non-animal sourced dairy products with the label "milk." *See id.* at 23. Plant-based foods like those produced by Miyoko's rely on their ability to differentiate themselves from animal-based products to ensure that consumers get what they expect when purchasing these foods. *See* Schinner Decl. ¶ 6; Simon Decl. ¶ 13. The statements and images that the State targeted in its letter "are essential to communicate [the company's] mission and brand." Cohen Decl. ¶ 13.

The choices that Miyoko's faces for its future labels and marketing are even more vexing. The state's position "has had a chilling effect on [the company's] plans for future labeling and advertising." Schinner Decl. ¶ 19. As Ms. Schinner explains, "For each new label, we now have to ask ourselves: Is the State going to consider this 100% truthful message about our 100%-plant-based products illegal and order us to alter our message? And, if so, is it worth the risk to us? Should we censor ourselves in advance? Or should we continue to tell our customers the truth about our products?" *Id.* ¶ 15; *see* Allsopp Decl. ¶ 6 (explaining that the letter has "chilled innovation" in the branding department, because "[n]ow when [it is] developing new branding for our products, we have to question what to call them, and what words and imagery can and cannot be used on the product packaging"). The company's leadership is afraid that any possible change to its labeling, branding, or marketing "might be 'poking the bear' and spur further enforcement action from the Branch." *Id.* ¶ 8.

Miyoko's "believes in [its] core mission" and doesn't "want to change [its] message." Schinner Decl. ¶ 19. But the company—and its suppliers, partners, and investors—are concerned that the Department's legal position will continue to restrict Miyoko's from truthfully proclaiming this deeply held mission to the public. *Id.* ¶¶ 1, 8, 14, 17–19; *see* Allsopp Decl. ¶ 9. In fact, the State's letter has even chilled the company's public advocacy. The recent COVID-19 pandemic, for example, has "dramatically increased public consciousness about the dangers and evils of industrial animal agriculture . . . for workers, for public safety, and for the good of the planet," and has increased consumer demand for alternatives to animal-based products. Cohen Decl. ¶ 11. But, because of the State's enforcement action, "Miyoko's has been forced to proceed cautiously and not

fully join this public conversation." *Id.* "[F]or a mission-driven company like" Miyoko's, "this situation is untenable." Schinner Decl. ¶ 1.

## ARGUMENT

A plaintiff seeking a preliminary injunction must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Cuviello*, 944 F.3d 825. All of the preliminary-injunction factors are satisfied here.

## I.    Miyoko's First Amendment claim is likely to succeed.

In demanding that Miyoko's remove language and images from its product labels and website, the State has indisputably restricted Miyoko's speech. Yet, as numerous courts have recognized, no reasonable consumer could be misled or confused by Miyoko's speech—in fact, customers buy Miyoko's products specifically because they are advertised as "plant-based" and "vegan" butters and cheeses. Thus, the State's attempt to censor Miyoko's can stand only if the state can show that its action directly advances a substantial governmental interest and that the action is narrowly tailored to serve that interest. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). Because the State fails at every step of that test, its enforcement action against Miyoko's violates the First Amendment.

### A.    *The State shoulders a heavy burden to prove that its restrictions on Miyoko's commercial speech satisfy heightened scrutiny.*

The First Amendment "requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Sorrell*, 564 U.S. at 566. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Such "[v]iewpoint discrimination" is "an egregious form of content discrimination." *Id.*

"Commercial speech is no exception." *Sorrell*, 564 U.S. at 566; *see Matal v. Tam*, 137 S. Ct. 1744, 1767 (2017) (opinion of Kennedy, J.) ("[D]iscrimination based on viewpoint . . . remains of serious concern in the commercial context."). The Supreme Court has long held that the

"dissemination of information as to who is producing and selling what product, for what reason, and at what price" is speech "protected by the First Amendment." *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 770 (1976). Because "[i]t is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed, . . . the free flow of commercial information is indispensable." *Id.* at 765.

Here, there is no dispute that the State has targeted Miyoko's commercial speech. Thus, this Court must, at a minimum, "apply the intermediate scrutiny test mandated by *Central Hudson* in commercial speech cases where the government acts to restrict or prohibit speech, on the ground that in such cases intermediate scrutiny appropriately protects the interests of both the speaker (the seller) and the audience (the purchaser)." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019). That test asks four questions: (1) whether the speech "concern[s] lawful activity and [is] not . . . misleading"; (2) "whether the asserted governmental interest" justifying the restriction "is substantial"; (3) "whether the [restriction] directly advances the governmental interest asserted"; and (4) whether the restriction "is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. Provided that the speech is not false or inherently misleading—as is the case here—"[e]ach of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002).

"California's burden under this test is heavy." *Italian Colors Rest*, 878 F.3d at 1176. This burden cannot be "satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *see Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 143 (1994) ("[T]he free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful."). "[O]therwise, a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995).

And the State's action here reaches beyond the company's purely commercial advertising and marketing. Instead, the State seeks to prevent the company from expressing its deeply-held mission of promoting sustainable food chains and reducing animal cruelty through images of rescued cows and statements like "100% cruelty free"—arguably core *political* speech. This case is, in other words, "a hybrid . . . that implicates commercial and political speech." *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008); *see Bloom v. O'Brien*, 841 F. Supp. 277, 281 (D. Minn. 1993) ("[T]he common sense distinction between commercial and political speech breaks down in this case."). Nevertheless, this Court need not "pin down where the political nature of these speech restrictions ends and the commercial nature of the restrictions begins" here, *BellSouth*, 542 F.3d at 505, because (as we explain below) "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied," *Sorrell*, 564 U.S. at 571.

### B.    *Miyoko's truthful and accurate descriptions of its plant-based dairy products are not misleading.*

To "merit[] First Amendment scrutiny as a threshold matter," the speech at issue must not be "misleading." *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010). As the Supreme Court explained in *Central Hudson*, "[t]he government may ban form[s] of communication which are more likely to deceive the public than to inform it." 447 U.S. at 563.

The State cannot plausibly argue that the speech it has targeted here is inherently misleading or deceptive. Miyoko's makes clear on all of its product labels and marketing materials that its products are "plant-based," "vegan," and "made from plants." Schinner Decl. ¶ 6. Through these same means of expression, the company also encourages customers to replace conventional dairy products with Miyoko's products, to adopt a plant-based diet, and to embrace a "phenomenally vegan" lifestyle. *Id.* ¶¶ 6, 10. No reasonable consumer would be misled by this speech to believe that Miyoko's products are in fact traditional animal-based dairy products.

This Court has already recognized this to be true. For example, in *Gitson v. Trader Joe's Co.*, the plaintiffs challenged "the use of the word 'soymilk' by Trader Joe's to describe products that don't contain cow's milk." 2015 WL 9121232, at *1 (N.D. Cal. Dec. 1, 2015). The court found that

"[t]he plaintiffs cannot state a claim because they have not articulated a plausible explanation for how 'soymilk' is misleading." *Id.* "The reasonable consumer (indeed, even the least sophisticated consumer) does not think soymilk comes from a cow," the court explained. *Id.* "To the contrary, people drink soymilk in lieu of cow's milk." *Id.*

Similarly, in *Ang v. Whitewave Foods Co.*, the plaintiffs claimed they were deceived by "names like 'soymilk,' 'almond milk,' and 'coconut milk,' since the [products] are plant-based, and the FDA defines 'milk' as a substance coming from lactating cows." 2013 WL 6492353, at *1. The court, however, easily concluded "that the names 'soymilk,' 'almond milk,' and 'coconut milk' accurately describe Defendants' products. . . . [T]hese names clearly convey the basic nature and content of the beverages, while clearly distinguishing them from milk that is derived from dairy cows." *Id.* at *4. "Moreover," the court continued, "it is simply implausible that a reasonable consumer would mistake a product like soymilk or almond milk with dairy milk from a cow. The first words in the products' names should be obvious enough to even the least discerning of consumers." *Id.* The court observed that "adopting Plaintiffs' position might lead to more confusion, not less." *Id.* As the court concluded: "Plaintiffs essentially allege that a reasonable consumer would view the terms 'soymilk' and 'almond milk,' disregard the first words in the names, and assume that the beverages came from cows. The claim stretches the bounds of credulity. Under Plaintiffs' logic, a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper." *Id.*

The Ninth Circuit has also recognized that labeling similar to that of Miyoko's can't plausibly cause customer confusion. In *Painter v. Blue Diamond Growers*, the plaintiff alleged that "consumers will be deceived into thinking almond milk has the same nutritional value as cow's milk." 2017 WL 4766510, at *2 (C.D. Cal. May 24, 2017), *aff'd*, 757 F. App'x 517 (9th Cir. 2018). The district court described the "claim of customer confusion is patently implausible," finding that "[n]o reasonable consumer could be misled by Defendant's unambiguous labeling" *Id.* at *2–*3. "By using the term 'almond milk,'" the court continued, "even the least sophisticated consumer would know instantly the type of product they are purchasing." *Id.* The Ninth Circuit affirmed this reasoning,

holding that the complaint did "not plausibly allege that a reasonable consumer would be deceived into believing that [the company's] almond milk products are nutritionally equivalent to dairy milk based on their package labels and advertising." 757 F. App'x at 519.

This common-sense understanding of reasonable consumer expectations applies with equal force in the context of First Amendment challenges to restrictions on food labeling. For example, in *Turtle Island Foods*, the court concluded that there was no legitimate possibility of consumer deception that could support the State of Arkansas' attempt to restrict truthful terms like "burger," "meat," "beef," and "sausage" on plant-based products whose labels, like Miyoko's, "include[d] ample terminology to indicate the vegan or vegetarian nature of the products." 424 F. Supp. 3d at 573–74. To conclude otherwise, the court reasoned, one would have to make the unwarranted assumption that a reasonable consumer would "disregard" the "words found on the label." *Id.* (citing *Ang v. Whitewave Foods Co.*, 2013 WL 6492353, at *1). Similarly, in *Ocheesee Creamery*, the Eleventh Circuit found that Florida's attempt to restrict truthful use of the words "skim milk" on the label of milk bottles sold in stores could not withstand First Amendment scrutiny. 851 F.3d 1228 at 1239. The principle that the court articulated there controls this case just as well: "[S]tatements of objective fact, such as the Creamery's label, are not inherently misleading absent exceptional circumstances." *Id.*; *see also Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 637 (6th Cir. 2010) (concluding that a claim on product labels that milk is free of recombinant bovine growth hormone is not "inherently misleading" because it "informs consumers of a meaningful distinction between conventional and other types of milk").

These courts' conclusions are consistent with empirical evidence and federal enforcement history. A recent study found that consumers were "generally accurate at identifying nutritional differences between plant-based and animal-based milk and cheese products," and also found no confusion on the part of consumers about differences between animal and non-animal sourced dairy products with the label "milk." Ex. F to Sawhney Decl., at 2–3, 12–13, 23. Tellingly, the FDA has consistently chosen not to take enforcement action against plant-based dairy alternatives under 21 C.F.R. § 102.5(a), which requires that food products "accurately identify or describe . . . the basic

nature of the food or its characterizing properties or ingredients." Nor has it taken action against plant-based producers for violating requirements that a product using the word "butter" must contain "80 per centum by weight of milk fat." 21 U.S.C. § 321a. To the contrary, the FDA has repeatedly recognized that foods that do not meet FDA's threshold for "butter" can of course use the term "butter" in their common or usual name—products like peanut butter and apple butter, and all sorts of other fruit and nut butters, have used the term "butter" for well over a hundred years without any hint of consumers confusing them for butter from cow's milk. *See, e.g.*, 21 C.F.R. §§ 164.150 (peanut butter), 150.110 (fruit butter).

Indeed, the use of the word "butter" to encompass plant-based products has become so ubiquitous that it is featured in standard dictionary definitions. Merriam-Webster, for example, defines "butter" as "a buttery substance: such as (a): any of various fatty oils remaining nearly solid at ordinary temperatures; (b): a creamy food spread *especially one made of ground roasted nuts*." *Butter*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/butter (emphasis added). And plant-based dairy terms have become so established in the United States that the FDA *itself* uses them. *See Ang*, 2013 WL 6492353, at *3 (observing that "the FDA regularly uses the term soymilk in its public statements"). Under these circumstances, it is not enough for the State to say that Miyoko's use of certain terminology is "inconsistent with the state's preferred definition" and, on that basis, "inherently misleading." *Ocheesee Creamery*, 851 F.3d at 1238. Otherwise, "[a]ll a state would need to do would be to redefine the pertinent language in accordance with its" agenda and then "all usage in conflict" that agenda "would be inherently misleading and fail *Central Hudson*'s threshold test." *Id.* That "self-evidently circular reasoning" would "eviscerate *Central Hudson*." *Id.* Instead, "the state must present evidence" of real-word deception or confusion. *Id.*

In this case, that is an impossible task for the State. In fact, it is the State's actions that will cause consumer confusion. Consumers *rely* on the labeling and marketing of plant-based dairy products to differentiate them from animal-based dairy products. Terms like "vegan butter" and "plant-based cheese" enable customers to find plant-based products that can fulfill the same role that conventional animal dairy traditionally played in consumers' meals. *See* Schinner Decl. ¶ 6. As

another court has explained, "the simple use of a word frequently used in relation to animal-based [products] does not make use of that word in a different context inherently misleading. This understanding rings particularly true since the labels also make disclosures to inform consumers as to the plant-based nature of the products contained therein." *Turtle Island Foods*, 424 F. Supp. 3d at 573–74. Indeed, it is critical for companies like Miyoko's to include these truthful and accurate qualifiers (e.g., "vegan" and "plant-based"), because their customers "specifically do not wish to eat animal-based dairy products." Schinner Decl. ¶ 6.

Yet the State is now requiring Miyoko's to "find[] terminology and imagery that communicates the purpose of [its] products without being able to truthfully express it or allude to it." *Id.* ¶ 18. As Miyoko's founder explains, adopting such "new messaging and nomenclature" that does not describe plant-based alternatives with terms familiar to consumers is far more likely to cause "confusion among consumers." *Id.* ¶ 16. In other words, it is the State's demanded changes that would mislead consumers—not Miyoko's truthful and accurate speech.

Not to mention that there simply is no conceivable basis for the State to argue that the other speech it attempts to censor—in particular, images of people hugging rescued cows and statements like "100% cruelty free" on Miyoko's website—could in any way confuse or mislead consumers. That speech, which does not even relate to the nature of the specific product being sold to customers, "do[es] more than propose a commercial transaction." *White v. City of Sparks*, 500 F.3d 953, 957 (9th Cir. 2007). It expresses the company's core mission and its belief that plant-based dairy is better for animal welfare and the environment than animal-based dairy. Schinner Decl. ¶¶ 2, 4, 8. In short, "what is going on here is more than just a debate about how best to sell toothpaste." *BellSouth*, 542 F.3d at 505; *see 44 Liquormart Inc., v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality) (noting that "commercial speech bans not only hinder consumer choice, but also impede debate over central issues of public policy"). That the State's enforcement action reaches out to target speech expressing a view on an issue of public debate is further reason to suspect that the State is acting not to protect consumers against confusion, but existing industry interests against new voices like Miyoko's.

1

**C.      The State cannot satisfy the remaining *Central Hudson* factors.**

2

3      The State simply cannot establish that its attempted censorship of Miyoko's speech directly

4  advances any substantial government interest under *Central Hudson*. *See* 447 U.S. at 566. To be sure,

5  preventing deceptive and misleading advertising may be a legitimate government interest. *See, e.g.,*

6  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (recognizing "the

7  State's interest in preventing deception of consumers"); *Ocheesee Creamery*, 851 F.3d at 1240 (same). But

8  here, as we have explained, Miyoko's truthful speech is *not* in any sense misleading or deceptive.

9  Thus, preventing Miyoko's speech "does not 'directly and materially' advance the State's asserted

10  interest." *Turtle Island Foods*, 424 F. Supp. 3d at 575. As the Supreme Court has made clear, "rote

11  invocation of the words 'potentially misleading'" cannot "supplant the [government's] burden."

12  *Ibanez*, 512 U.S. at 146. A state must demonstrate, with hard evidence, that "its fear of consumer

13  confusion is real" before taking the significant step of prohibiting speech. *BellSouth*, 542 F.3d at 509;

14  *see Int'l Dairy Foods Ass'n*, 622 F.3d at 638-39 (conducting detailed examination of State's evidence of

15  consumer confusion and concluding that "the proof falls far short of establishing that Ohio

16  consumers have been misled by dairy-product labeling"). California has not—and cannot—make

17  that showing.

18      For similar reasons, California's restrictions on Miyoko's speech are "more extensive than is

19  necessary to serve [its] interest." *Central Hudson*, 447 U.S. at 566. Even if the state had evidence that

20  customers were confused by Miyoko's product labeling (which it doesn't), the appropriate solution

21  would not be for the company to delete the phrase "butter" or "cheese" from its product labels or

22  remove images of cows from its website. *See Ocheesee Creamery*, 851 F.3d at 1240 ("[N]umerous less

23  burdensome alternatives existed . . . that would have involved additional disclosure without

24  banning the term 'skim milk.'"). Instead, the appropriate remedy would be for Miyoko's to inform

25  consumers that its products are *not* made from animal dairy. *See Bates v. State Bar of Ariz.*, 433 U.S.

26  350, 375 (1977) (noting that "the preferred remedy" when the First Amendment is at issue is "more

27  disclosure, rather than less"); *Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999). (explaining that the

28  Supreme Court has held that "disclaimers as constitutionally preferable to outright suppression"). If

the State were really concerned about consumer confusion (as opposed to trying to stamp out competition on behalf of the State's conventional dairy industry), it could "require more prominent disclosures of the vegan nature of plant-based products, create a symbol to go on the labeling and packaging of plant-based products indicating their vegan composition, or require a disclaimer that the products do not contain meat." *Turtle Island Foods*, 424 F. Supp. 3d at 576. Of course, Miyoko's already makes the nature of its products abundantly clear, so a disclosure of this kind would be redundant—all of its products and marketing prominently stress that they are "vegan," "plant-based," and "made with plants."

Nor can the State point to any other interests, such as protection of consumers' health or safety, to justify its actions against Miyoko's speech. The government cannot satisfy its burden under *Central Hudson* with "mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. The State simply has no basis to argue that preventing Miyoko's from describing its products as "vegan" and "plant-based" "butters" and "cheese"—or requiring Miyoko's to remove images of people hugging cows from its website—can further public health or safety.

That there is so little basis to justify the enforcement action here indicates that the government's "stated interests are not the actual interests served by the restriction." *Edenfield*, 507 U.S. at 768. Rather than protecting consumers from confusion and mislabeling, the State's enforcement action against Miyoko's "gives rise to suspicion" that it is motivated by "an impermissible purpose"—that is, the Milk and Dairy Food Safety Branch's impermissible interest in "protect[ing] members of the agricultural industry." *Animal Legal Defense Fund*, 878 F.3d at 1198. The "lack of evidence" showing consumer deception or confusion "combined with" the animal-based dairy industry's "aggressive lobbying" "call[s] into question the [state's] purported interest in preventing consumer deception." *Safelite Grp., Inc. v. Rothman*, 229 F. Supp. 3d 859, 882 (D. Minn. 2017); *see generally* David C. Vladeck, *Lessons from A Story Untold:* Nike v. Kasky *Reconsidered*, 54 Case W. Res. L. Rev. 1049, 1056 (2004) (describing how commercial speech restraints "that swept too broadly

or that [are] imposed for less-than-substantial reasons, such as economic protectionism (e.g., dampening competition for professional services) . . . [are] subject to invalidation").

It is no secret that the conventional dairy industry believes that the rising demand for plant-based dairy products threatens its market share, and that animal-based dairy companies have sought to enlist legislators' and regulators' help to ward off these new competitors by advocating that the government control the language plant-based producers may use. *See* Simon Decl. ¶ 11; Allsopp Decl. ¶ 7; Jareb Gleckel & Sherry Colb, *The Meaning of Meat*, 26 Animal L. Rev. 75, 77 (2020) (describing lobbying efforts by the conventional meat and dairy industries at the state and federal levels, including the recent adoption of so-called "Tag-Gag" laws). Nor is this the first time that the Department has added the government's weight on the scale to favor animal-based dairy. The California Milk Processor Board—administered by CDFA and most famous for its ubiquitous "*Got Milk?*" ads—not only advocates that consumers purchase conventional dairy products but specifically advocates that they do so over plant-based alternatives.[2] And the California Milk Advisory Board, "an instrumentality of the California Department of Food and Agriculture," admittedly "exist[s] for one purpose: to spread the word about extraordinary dairy products made with Real California Milk."[3]

It's one thing for the government to promote an important domestic industry. But it's another when a government agency uses its authority to denigrate another less powerful, upstart industry—and for that same agency to restrict the speech of the less powerful industry to protect the more powerful one. The First Amendment prevents the government from restricting speech in a manner that takes sides on an important public debate. Indeed, "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). "[T]o permit one side of a debatable public question to

---

[2] Cal. Milk Processor Bd., *Milk Versus the Alternatives*, https://www.gotmilk.com/milk-versus-the-alternatives (last visited May 26, 2020).

[3] Real California Milk, *About Us*, https://www.realcaliforniamilk.com/about-us (last visited May 26, 2020).

have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees." *Madison Joint School Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–176 (1976).

## II. Miyoko's is already suffering—and will continue to suffer—irreparable harm without preliminary injunctive relief.

"Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA*, 928 F.3d at 851. Indeed, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Id.* "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). The Ninth Circuit's "cases do not require a strong showing of irreparable harm for constitutional injuries." *Cuviello*, 944 F.3d at 833. "In situations where the plaintiff's 'First Amendment rights [are] being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance.'" *Id.*

That is the case here. Miyoko's has already suffered irreparable injury as a result of California's threat of censorship. And, absent this Court's intervention, the company will continue to suffer irreparable injury—not only because its First Amendment rights are "being chilled daily," but also because it will have to expend significant time, expense, and effort completely revamping its product labeling and marketing. *See, e.g.*, *All. of Auto. Mfrs. v. Hull*, 137 F. Supp. 2d 1165, 1171 (D. Ariz. 2001) ("The presumption of irreparable injury in a motion for preliminary injunction undoubtedly extends to expression of purely commercial information.").

As to the chilling effects that have already occurred: The company has edited and removed branding videos out of fear of further enforcement, refrained from using other truthful phrases like "GMO-free" on its product labels, and considered eliminating its new brand theme for its entire product line—a picture of Miyoko hugging a rescued cow. *See* Allsopp Decl. ¶¶ 2, 5–6, 8; Cohen Decl. ¶¶ 4–5, 7–9, 14. These changes—along with the other changes that the State has demanded— will make it more difficult for Miyoko's to accurately and truthfully convey the nature of its products and its mission to consumers, potentially causing Miyoko's to lose customer goodwill and

even market share. *See* Schinner Decl. ¶¶ 1, 16, 18; Cohen Decl. ¶¶ 3, 5, 7, 11–14; Allsopp Decl. ¶¶ 3–10. And "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales v. John D. Brush*, 240 F.3d 832, 841 (9th Cir. 2001); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be redressed by legal or an equitable remedy following a trial.").

What's more, in light of Miyoko's leadership in the industry, if it is "silenced," that "will send a chilling effect throughout the marketplace for other plant-based dairy producers." Cohen Decl. ¶ 13; *see also* Simon Decl. ¶ 12 ("Under the circumstances, even companies that have not received enforcement letters themselves would be reasonable in rethinking their own marketing and packaging practices based on seeing what happened to Miyoko's.").

Moreover, as a result of the State's letter, Miyoko's has had to consider changing its labeling and marketing materials for its entire line of products—a task that will cost millions of dollars and require substantial time and effort. *See* Schinner Decl. ¶¶ 1, 14, 16; Cohen Decl. ¶¶ 5–6. And, absent a court order declaring the State's enforcement unconstitutional, Miyoko's will have to continue to censor its own speech moving forward or risk significant penalties. *See* Schinner Decl. ¶¶ 1, 11, 15, 16–19. As a court explained when granting a similar request for preliminary injunction, the Department's letter presents Miyoko's with an array of unenviable choices: "(1) risk civil penalties by continuing its current marketing and packaging practices; (2) create specialized marketing and packaging practices for [California], including attempting to police spillover from marketing in nearby states; (3) change its marketing and packaging practices nationwide; or (4) refrain from marketing or selling its products in [California] at all." *Turtle Island Foods*, 424 F. Supp. 3d at 578. "Each of these options represent a potential burden, and corresponding chilling effect, on [Miyoko's] commercial speech rights." *Id.* That is particularly the case because the Department has the power to "impose[] criminal sanctions for" Miyoko's "failure to comply." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

These burdens are not slight or theoretical—they threaten Miyoko's survival. Several years ago, the Department demanded that The Cultured Kitchen, a plant-based foods company, similarly remove any mention of the word "cheese" from its labels for its cashew-cheese products. *See* Taimie L. Bryant, *Social Psychology and the Value of Vegan Business Representation for Animal Law Reform*, 2015 Mich. St. L. Rev. 1521, 1537–42 (2015). Although the company tried to persuade the Department that its labels were not confusing and that compliance would be exceedingly burdensome, "the CDFA stuck to its stringent reading of the statutes, forcing TCK to change its labeling or sue." *Id.* at 1541. "TCK had been unable to operate for a substantial period of time due to CDFA delays in response, could not afford to litigate, and changed its label." *Id.* "[T]he expense and time involved in compliance" with the State's demand "could break a fledgling company" like Miyoko's by "preventing its products from reaching market" and "preventing consumer access to products they are seeking." *Id.* Such harm is surely irreparable.

Finally, the State's aggressive enforcement position has even led Miyoko's and its leadership to censor their arguably non-commercial speech. The State has prevented Miyoko's from using pro-animal messaging on its website and marketing materials—such as images of people hugging rescued farm animals and statements like "100% cruelty free"—to advocate for a more sustainable and humane alternative to animal-based agriculture. Schinner Decl. ¶¶ 1, 3, 10; Cohen Decl. ¶¶ 4–5, 12–13. And it has even forced the company and its founder to refrain from fully weighing in on the growing public debate over industrial animal agriculture, meat processing, and the coronavirus pandemic—despite Miyoko's history of activism and advocacy for plant-based foods—because they are worried about risking further enforcement action. Cohen Decl. ¶ 11. The Ninth Circuit has made clear that delaying a person's ability to engage in this kind of speech by "even a day or two" is "particularly irreparable." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

## III.   The balance of the equities and the public interest weigh in favor of a preliminary injunction.

That Miyoko's has "raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [its] favor." *Am. Beverage Ass'n v. City & Cty. of San Francisco*,

916 F.3d 749, 758 (9th Cir. 2019) (en banc). As the Ninth Circuit has held, "the equities tip in favor of the plaintiff[]" where it has "a significant First Amendment and economic interest in engaging in [commercial] speech" and where the State "need not impede that speech in order to pursue its . . . goals." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828–29 (9th Cir. 2013). Here, of course, acquiescing to the Department's demands will require Miyoko's to censor its own commercial speech, from its product labels to the messaging on its website. And complying with the Department's letter will not only require Miyoko's to spend millions of dollars in rebranding, designing, and producing new product labels and marketing materials, but it also will negatively affect the relationship the company has with its customers—who buy Miyoko's products precisely because they are plant-based alternatives to conventional dairy products. By contrast, enjoining the Department of Food and Agriculture from taking enforcement against Miyoko's based on the company's truthful expression of its core mission will impose no cost or hardship on the State.

Likewise, the Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Am. Beverage Ass'n*, 916 F.3d at 758. "Indeed, 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Id*. For these reasons too, preliminary injunctive relief is warranted.

## CONCLUSION

The Court should grant Miyoko's motion for preliminary injunction and enjoin the defendants from taking any enforcement action against Miyoko's relating to the demands, requirements, and other information set forth in the Department's December 9, 2019 letter. A proposed preliminary-injunction order is attached.

Dated: May 26, 2020

Respectfully submitted,

*/s/ Neil K. Sawhney*
Neil K. Sawhney (State Bar No. 300130)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

Deepak Gupta (*pro hac vice*)
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

Alene Anello (State Bar No. 316387)
**ANIMAL LEGAL DEFENSE FUND**
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
*aanello@aldf.org*

*Attorneys for Plaintiff Miyoko's Kitchen*