1    XAVIER BECERRA
     Attorney General of California
2    MYUNG J. PARK
     Supervising Deputy Attorney General
3    LINDA L. GANDARA, State Bar No. 194667
     MICHAEL S. DORSI, State Bar No. 281865
4    Deputy Attorneys General
       455 Golden Gate Avenue, Suite 11000
5      San Francisco, CA  94102-7004
       Telephone:  (415) 510-3802
6      Fax:  (415) 703-5480
       E-mail:  Michael.Dorsi@doj.ca.gov
7    *Attorneys for Defendants*

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11

12

13   **MIYOKO'S KITCHEN,**                    3:20-cv-00893-RS

14                            Plaintiff,      **DEFENDANTS' OPPOSITION TO
                                              MOTION FOR PRELIMINARY
15        v.                                  INJUNCTION**

16   **KAREN ROSS, in her official capacity as   Date:         August 13, 2020
     Secretary of the California Department of   Time:         1:30 p.m.
17   Food and Agriculture, and STEPHEN           Courtroom:    3[1]
     BEAM, in his official capacity as Branch    Judge:        Honorable Richard Seeborg
18   Chief of the Milk and Dairy Food Safety
     Branch,**                                   Trial Date:   Not Set
19                                               Action Filed: February 6, 2020
                             Defendants.**
20

21

22

23

24

25

26

27        [1] Defendants are aware that, in accordance with Northern District of California General
     Order No. 72, the Court will not hold oral in-person argument, and will hold a telephonic or
28   videoconference argument if the judge determines that a hearing is necessary.

---

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................... 1

Background and Evidence ............................................................................................... 1

    I.      Federal Rules Limit State Discretion in Food Labeling Regulation ..................... 1

    II.     The Department's December 9 Letter Accords with Existing Law ...................... 3

    III.    There is No Conspiracy Against Plant-Based Producers...................................... 5

Legal Argument ............................................................................................................... 6

    I.      Legal Standards ................................................................................................... 6

    II.     Miyoko's is Not Likely to Prevail on the Merits................................................. 7

          A.      Miyoko's Claim That its Product is Hormone Free is Not Entitled to First Amendment Protection Because it is False .................................7

          B.      The Department's Adherence to Standards of Identity for Butter and Margarine is Permissible Under the First Amendment ......................9

          C.      The Department is Correct to Require Miyoko's to Remove Statements Associated with Dairy Products from Its Package................ 12

    III.    Miyoko's Does Not Face Imminent or Irreparable Harm................................... 14

          A.      Miyoko's Alleged Constitutional Harm is Not Imminent....................... 14

          B.      Miyoko's Self-Censorship in Other Contexts is Not Redressable by This Motion .......................................................................................... 14

    IV.    The Balance of Equities and Public Interest Favor Permitting the Department's Consumer Protection Regulation.................................................. 15

Conclusion..................................................................................................................... 16

Defendants' Opposition to Motion for Preliminary Injunction (3:20-cv-009893-RS)

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alliance for Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) ........................................................................... 7

*Caribbean Marine Servs. Co. v. Baldrige*
  844 F.2d 668 (9th Cir. 1988) ..................................................................... 6, 14

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
  447 U.S. 557 (1980) ...........................................................................7, 8, 9

*City of South Lake Tahoe v. California Tahoe Regional Planning Agency*
  625 F.2d 231 (9th Cir. 1980) ..................................................................... 14

*Commercial Mfg. Co. v. Fairbank Canning Co.*
  135 U.S. 176 (1890) ............................................................................... 2

*Daubert v. Merrell Dow Pharm., Inc.*
  509 U.S. 579 (1993) ............................................................................... 5

*Doran v. Salem Inn, Inc.*
  422 U.S. 922 (1975) .............................................................................. 15

*Duran v. Hampton Creek*
  No. 3:15-cv-05497-LB, 2016 WL 1191685 (N.D. Cal. Mar. 28, 2016) .....................10, 12, 16

*Earth Island Inst. v. Carlton*
  626 F.3d 462 (9th Cir. 2010) ...................................................................... 7

*Edenfield v. Fane*
  507 U.S. 761 (1993) .............................................................................. 10

*Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1086 (2008) ....................................... 2

*Fed. Sec. Adm'r v. Quaker Oats Co.*
  318 U.S. 218 (1943) .............................................................................. 10

*Int'l Dairy Foods Ass'n v. Boggs*
  No. 2:08-CV-628, 2009 WL 937045 (S.D. Ohio Apr. 2, 2009) ....................................... 8

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
  634 F.2d 1197 (9th Cir. 1980) ..................................................................... 6

*Maldonado v. Morales*
  556 F.3d 1037 (9th Cir. 2009) .................................................................... 11

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Maryland v. King*
  567 U.S. 1301 (2012) ................................................................................................ 16

*Metro Lights, L.L.C. v. City of Los Angeles*
  551 F.3d 898 (9th Cir. 2009) .................................................................................... 7, 9

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
  434 U.S. 1345 .......................................................................................................... 16

*Perfect 10, Inc. v. Google, Inc.*
  653 F.3d 976 (9th Cir. 2011) .................................................................................... 15

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*
  530 F.3d 724 (8th Cir. 2008) .................................................................................... 16

*Pub. Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*
  632 F.3d 212 (5th Cir. 2011) .................................................................................... 10

*Show Media California, LLC v. City of Los Angeles*
  479 F. App'x 48 (9th Cir. 2012) .............................................................................. 11

*Smith v. Reiskin*
  No. 4:18-cv-01239-JSW, 2018 WL 7820727 (N.D. Cal. Oct. 10, 2018) ............... 16

*United States v. Schiff*
  379 F.3d 621 (9th Cir. 2004) ...................................................................................... 8

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) ................................................................................................. 10

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ....................................................................................................... 6

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*
  471 U.S. 626 (1985) ......................................................................................... 7, 8, 16

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend 1 ......................................................................................... *passim*

**STATUTES**

21 United States Code
  § 321a ......................................................................................................... 2, 4, 11, 16
  § 343(b) ....................................................................................................................... 2
  § 343(g) ....................................................................................................................... 2

**TABLE OF AUTHORITIES**
(continued)

Page

California Food & Agricultural Code
  § 32912.5 .......................................................................................................... 2
  § 32913 .............................................................................................................. 2
  § 37162 .............................................................................................................. 2
  § 38946 .............................................................................................................. 6
  § 38955 .......................................................................................................... 1, 4
  § 39501 .............................................................................................................. 3
  § 39521 ........................................................................................................ 4, 16

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

21 Code of Federal Regulations
  § 101.18 ........................................................................................................ 5, 12
  § 102.5 ............................................................................................................. 12
  § 102.5(a) ............................................................................................................ 5
  § 130.8 ....................................................................................................... 2, 5, 12
  § 150.110 ........................................................................................................... 12
  § 164.110 ........................................................................................................... 12
  § 166.110 ..................................................................................................... 2, 10

42 Federal Register
  14,445 .............................................................................................................. 12
  14,475 .............................................................................................................. 12

**OTHER AUTHORITIES**

Nicole Axworthy, *Wisconsin Department of Agriculture Orders Removal of
  Miyoko's Vegan Butter from Store Shelves*, VegNews (June 20, 2019) ................................. 14

Black's Law Dictionary (11th ed. 2019) .................................................................... 13

Press Release, Cal. Dep't of Pub. Health, CDPH Warns Not to Eat the Cultured
  Kitchen's Cashew Cheese Products Due to Health Risk (Dec. 31, 2013) ............................ 15

Earth Balance ................................................................................................. 3

A. Bryan Endres, *United States Food Law Update: Consumer Protections and
  Access to Information: rBST, BPA, the ADA and Color Additives*, 4 J. Food L. &
  Pol'y 263, 267 (2008) ....................................................................................... 8

U.S. Dept. of Agric., Meat and Poultry Labeling Terms (2015) ................................... 9

Jeannine Bentley & Mark Ash, *Butter and Margarine Availability Over the Last
  Century*, U.S. Dep't of Agric. Econ. Research Serv. (July 5, 2016), ................................ 2, 11

Merriam-Webster.com Dictionary (2020) ...................................................... 13

1

**INTRODUCTION**

2

The California Department of Food and Agriculture applies uniform rules requiring food

3

producers to clearly identify their products.  These rules involve *standards of identity*—

4

definitions from federal and state statutes and regulations that require specific contents in foods.

5

Products that meet those standards must be called by that name, and products that do not meet the

6

standard must not be called by that name.  These decades-old standards define butter as made

7

from milk or cream and containing at least 80% fat.  Plant-based alternatives to butter are defined

8

as margarine or spreads.  Margarine outsold butter nationwide for decades, but no butter

9

manufacturer sought the Department's permission to call its product margarine.  Butter sales

10

surpassed margarine in 2005, and the term margarine has gone out of fashion.  Now Miyoko's

11

wants the Department's approval to call its plant-based product "vegan butter."

12

Miyoko's Kitchen, Inc. claims that it has a First Amendment right to label and market its

13

product as "butter."  Miyoko's may have lawfully avoided standard of identity for margarine by

14

making its product with about 78.5% fat (the margarine standard requires 80% fat or more).  But

15

that does not make it butter, nor does it confer a constitutional right to deviate from decades-old

16

consumer protection laws.  The Department rightly notified Miyoko's that (1) its product could

17

not be called butter, (2) the product could not incorrectly state that it is hormone free, and (3) the

18

product could not use other phrasing that may cause it to be confused with dairy products.[2]  Now

19

Miyoko's seeks a preliminary injunction blocking the Department from moving forward with

20

potential enforcement.  But Miyoko's has not made a showing that the First Amendment compels

21

California to break from the established practice, or that its injury outweighs the Department's

22

interest in effectuating democratically enacted statutes.

23

**BACKGROUND AND EVIDENCE**

24

**I.    FEDERAL RULES LIMIT STATE DISCRETION IN FOOD LABELING REGULATION**

25

Although laws regulating food marketing fall within states' traditional police powers, the

26

content of limits on marketing are, for the most part, set by the federal government.  The Food,

27

28

[2] The Department withdrew its fourth position, concerning an image of a woman hugging a cow on Miyoko's website.  *See* ECF No. 37 (citing Cal. Food & Agric. Code § 38955).

1

Drug, and Cosmetic Act ("FDCA") establishes a comprehensive scheme for food labeling.  The FDCA, as amended by the Nutrition Labeling and Education Act, preempts most state food labeling regulation that is not identical to federal rules.  *See, e.g.*, *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1086 (2008).  Although states may determine methods of enforcement, with few exceptions, states have only two options concerning labeling requirements: enforce the federal food labeling rules or enforce no food labeling rules at all.

The California Legislature elected to enforce the federal rules, directing the Secretary of the Department of Food and Agriculture to review and approve labels consistent with the Food, Drug, and Cosmetic Act and Title 21 of the Code of Federal Regulations for "milk, frozen and cultured dairy products, cheese, and products resembling milk products . . . ."  *See* Cal. Food & Agric. Code § 32912.5.  Federal law prohibits misbranding, including the sale of one food "under the name of another food."  21 U.S.C. § 343(b).  The same federal statute prohibits identifying a food by a name that has a federal standard of identity if it does not conform to that standard.  *See* 21 U.S.C. § 343(g); *see also* 21 C.F.R. § 130.8 (compliance with standards of identity).

The standard of identity for butter is clear and well-established.  The federal statute for butter dates to 1923 and requires the product to be made from milk or cream and contain at least 80% fat.  21 U.S.C. § 321a.  California's analogous statute for butter dates to 1967 and has the same 80% milk fat requirement.  Cal. Food & Agric. Code § 37162.  These standards of identity did not prohibit competition from plant-based alternatives; they simply allowed sales under other names: margarines and spreads.  *See* Cal. Food & Agric. Code § 32913.

As with butter, the federal government established a standard of identity for margarine, which also included an 80% minimum fat requirement.  *See* 21 C.F.R. § 166.110.  Although the invention of margarine by Hippolyte Mége (obtaining a prize from French Emperor Napoleon III) relied on animal fats, *see Commercial Mfg. Co. v. Fairbank Canning Co.*, 135 U.S. 176, 177 (1890), many modern margarines are exclusively plant-based.  From 1958 to 2005, margarine out-sold butter in the United States.  *See* Jeannine Bentley & Mark Ash, *Butter and Margarine Availability Over the Last Century*, U.S. Dep't of Agric. Econ. Research Serv. (July 5, 2016), https://perma.cc/BTN7-G9AQ.

2

1    Butter alternatives not conforming to the standards of identity for butter or margarine are

2    defined as "dairy spreads" if they contain dairy or "spreads" if they do not.  *See* Cal. Food &

3    Agric. Code §§ 39501 (dairy spreads), 39521 (spreads).  These include spreads marketed as vegan

4    alternatives to butter that have been on the market since the late 1990's.  *See, e.g.*, Earth Balance,

5    https://perma.cc/8MZ2-7S5B (describing first vegan spread product sold in 1998).

6    Like vegan spreads, dairy spreads cannot market themselves as butter.  The Department's

7    position is that federal and California law prohibit producers from identifying these products as

8    "butter."  *See* Second Declaration of Stephen Beam ("Beam Decl."), ¶¶7, 10.  The concept of

9    Miyoko's product—a plant-based alternative to butter—is not new.  What is new about Miyoko's

10   is its insistence on calling it "butter."  Miyoko's is the first producer of which the Department is

11   aware to seek approval for a label calling its 100% plant-based product "butter."  *See* Beam Decl.,

12   ¶11.  The Department responded in accord with federal and state law: it told Miyoko's that this is

13   not allowed.  *See* ECF No. 1-1 (December 9 letter).

14   ## II.   THE DEPARTMENT'S DECEMBER 9 LETTER ACCORDS WITH EXISTING LAW

15   The Department reviewed Miyoko's packaging in 2019.  Miyoko's "vegan butter"

16   identifies itself three ways: the fine print in the lower left hand corner says it is "Cashew &

17   Coconut Oil Spread", larger but still small print says it is "Cashew Cream Fermented With Live

18   Cultures," while the largest font (other than the name Miyoko's) toward the right side of the

19   package says "European Style Cultured Vegan Butter."

20

21    

27   Because Miyoko's label was unlike previous labels submitted for review, the Department

28   had to determine what the product was and what rules applied.  The Department concluded that

3

1    Miyoko's product does not satisfy the standard of identity because it is not a dairy product.  It

2    appeared to the Department that the "vegan butter" product may avoid the margarine standard of

3    identity because that standard requires that the margarine contain at least 80% fat.  Miyoko's

4    "Cultured Vegan Butter" product contains about 1.5% less.[3]  If this is correct, Miyoko's product

5    is a "spread."  *See* Cal. Food & Agric. Code § 39521 ("butter alternatives that contain less than

6    80% fat are defined as spreads").

7           The Department's letter dated December 9, 2019, identified five violations of state and

8    federal law.  The principal violation, listed second,[4] is that Miyoko's calls its product "butter,"

9    which it is not.  *See* ECF No. 1-1 ("The product cannot bear the name "Butter" because the

10   product is not butter.  'Butter' is a defined term in 21 U.S.C. 321a as a food product made

11   exclusively from milk or cream . . . .").

12          Next, the Department informed Miyoko's that it must remove the image of a person

13   hugging a cow from its website pursuant to California Food and Agricultural Code Section

14   38955.  The Department has since admitted that this statement was in error because Section

15   38955 requires a regulation (which has not been promulgated) and applies only to the package

16   itself.  *See* ECF No. 37 (citing Cal. Food & Agric. Code § 38955).  Having acknowledged that the

17   statute does not apply to Miyoko's, this issue is no longer in dispute.

18          The Department then addressed the phrase "Hormone Free" on the side of the box:

19

20

21   

22

23

24          [3] The Nutrition Facts indicate 11 grams of fat per 14 gram serving, equal to 78.57% fat.
     This may be due to rounding error—federal regulations call for rounding to the nearest gram—so
     it is possible that Miyoko's product does contain 80% fat.  If that is the case, the Department
25   believes the product would fall within the standards of identity for margarine.
          [4] The first listed violation is Miyoko's use of two statements of identity: "Cultured Vegan
26   Butter" and "Cashew Cream fermented with live cultures."  Miyoko's Complaint does not
     challenge this violation.  This is an ordinary consumer protection restriction.  However, the
27   Department's position that Miyoko's may not call its product "Cultured Vegan Butter" bears on
     which statement of identity Miyoko's may use.  Accordingly, this issue cannot be resolved
28   without resolving whether Miyoko's may title its product "vegan butter."

1    The Department stated that "Although the food may be of plant origin, plants also contain

2    endogenous hormones which regulate growth." ECF No. 1-1 at 2.  Miyoko's concedes that this

3    statement is true but contends that it does not matter because it means to refer to synthetic

4    hormones injected into cows.  *See* Complaint, ¶23.

5    The remaining claims in the December 9 letter concerned the phrases "Lactose Free,"

6    "Cruelty Free," and "Revolutionizing Dairy with Plants."  These phrases are of the type that a

7    customer may expect to find on specialized dairy products, such as lactose-free milk, milk from

8    free-range cows, or other human health and animal welfare-focused producers.  The Department's

9    noted that these claims "imply that the product may be a dairy food without these characteristics."

10   *See* ECF No. 1-1 at 2 (discussing 21 C.F.R. §§ 101.18, 102.5(a), and 130.8).

11   ### III.   THERE IS NO CONSPIRACY AGAINST PLANT-BASED PRODUCERS

12   Miyoko's alleges that the Department "targeted Miyoko's at the behest of lobbyists for the

13   dairy industry," Alsopp Decl. (ECF No. 23-3), ¶7, *see also* Simon Decl. (ECF No. 23-4), ¶11, but

14   offers no evidence beyond speculation and unfounded hearsay.  The truth is that the Department

15   applies the same rules to producers who use dairy in their imitation butter and producers who do

16   not.  *See* Beam Decl., ¶¶7, 10.  Miyoko's was the first label of its type, and the Department's

17   principal objection—to the identification of the product as "butter"—applies a well-established

18   definition codified in a 97-year-old federal statute.

19   Miyoko's fails to show this obvious objection was prompted by any improper influence.

20   For example, while the Simon Declaration (ECF No. 23-4) asserts that "[i]t's no secret that the

21   Milk and Dairy Food Safety Branch has been targeting PBFA members . . . after the National

22   Milk Producers Federation began writing letters complaining to the Branch," it identifies no

23   examples of enforcement nor letters by milk producers or their trade groups.  *Id.* at ¶11.  The

24   other assertions in the Simon Declaration similarly attest entirely to things that she heard from

25   others, none of whom are named.[5]  Similarly, paragraph 13 of the Schinner Declaration (ECF No.

26   23-1) attests to the declarant's understanding of other persons' experiences but provides no

---

[5] The Simon Declaration is also not expert testimony.  Her Declaration is simply an account of what other people told her, not an application of specialized knowledge.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

5

1    foundation for this knowledge.  The Allsopp and Cohen Declarations rely on speculation as well.

2    Paragraph 7 of the Allsopp Declaration (ECF No. 23-3) attests to a "strong susp[icion] that the

3    Branch targeted Miyoko's at the behest of lobbyists" based on unspecified lobbying efforts by the

4    dairy industry, but makes no reference to the federal and state statutes and federal regulations that

5    constrain the Department.[6]  And paragraph 11 of the Cohen Declaration (ECF No. 23-2) attests to

6    unsubstantiated fears that the Department would retaliate against Miyoko's if it "fully join[ed]

7    this public conversation" about the dangers of animal agriculture in light of the COVID-19

8    pandemic.

9        Although a court may consider hearsay statements on a motion for preliminary injunction,

10   it need not give them weight when they are not credible.  *See Caribbean Marine Servs. Co. v.*

11   *Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988).  Conclusory statements addressing topics about

12   which declarants lack personal knowledge carry little weight in showing imminent harm.  *See Los*

13   *Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980).

14   As explained during the Motion to Dismiss hearing and in the Second Beam Declaration, the

15   Department holds vegan food producers to the same standards as producers who use some dairy

16   in their butter alternatives.  And Miyoko's fear of retaliation by the Department is entirely

17   unfounded.  Even in the hearsay statements from unnamed sources, Miyoko's offers no examples

18   of retaliation by the Department.  This Court rightly declined to consider this evidence in

19   evaluating the Department's Motion to Dismiss, *see* ECF No. 33 at 2 n.1, and should disregard

20   such statements here.

## LEGAL ARGUMENT

### I.   LEGAL STANDARDS

23       "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

24   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

25   balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat.*

26   *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit apply a sliding scale, where

---

[6] The Allsopp Declaration also attests to injury after third parties read the December 9 letter.  *See* Allsopp Decl., ¶9.  This is a curious complaint because the Department kept the letter confidential, *see* Beam Decl., ¶14, as required by law, *see* Cal. Food & Agric. Code § 38946.

1    a greater showing on one factor may reduce a plaintiff's burden on another.  *Alliance for Wild*

2    *Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  But even applying the sliding scale, the

3    plaintiff must satisfy all four of the *Winter* factors.  *See id.* at 1135.

4           Miyoko's seeks injunctive relief concerning multiple different statements: the use of the

5    term "vegan butter," the claim that its product is "hormone free," and statements ordinarily

6    associated with dairy products.  This requested relief need not be evaluated as all-or-nothing.

7    "[D]istrict courts have broad latitude in fashioning equitable relief when necessary . . . ."  *Earth*

8    *Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (internal quotation omitted).

9    **II.    MIYOKO'S IS NOT LIKELY TO PREVAIL ON THE MERITS**

10          "The States and the Federal Government are free to prevent the dissemination of commercial

11   speech that is false, deceptive, or misleading . . . ."  *Zauderer v. Office of Disciplinary Counsel of*

12   *Supreme Court of Ohio*, 471 U.S. 626, 638 (1985).  "In *Central Hudson*, the Supreme Court

13   announced a four-part test for assessing the constitutionality of a restriction on commercial

14   speech: (1) if 'the communication is neither misleading nor related to unlawful activity,' then it

15   merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand

16   such scrutiny, (2) '[t]he State must assert a substantial interest to be achieved by restrictions on

17   commercial speech;' (3) 'the restriction must directly advance the state interest involved;' and (4)

18   it must not be 'more extensive than is necessary to serve that interest.'"  *Metro Lights, L.L.C. v.*

19   *City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (quoting *Cent. Hudson Gas & Elec. Corp.*

20   *v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564–66 (1980)).

21          **A.    Miyoko's Claim That its Product is Hormone Free is Not Entitled to First**
22                 **Amendment Protection Because it is False**

23          First, Miyoko's Motion makes no effort to show that it is likely to prevail that it has a

24   First Amendment right to state that its product is "hormone free."  Miyoko's has no such right

25   because its product is not hormone free.  Nonetheless, Miyoko's Proposed Order would explicitly

26   prohibit the Department from taking action based on this position.  *See* ECF No. 25-7 at 2:18–19

27   (¶2(b)).  The Court should quickly dispense with this requested relief.

28          Only when commercial speech is neither false nor misleading do courts apply the

                                                      7

1    remaining steps of the *Central Hudson* test.  *See Zauderer*, 471 U.S. at 638 (discussing *Central*

2    *Hudson*, 447 U.S. at 566), *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004) ("[T]he

3    government has the right to regulate false, misleading or deceptive commercial speech . . . .").

4    The Department explained in its letter that Miyoko's may not label its product as "hormone free"

5    because "although the food may be of plant origin, plants also contain endogenous hormones

6    which regulate growth."  ECF No. 1-1 at 2.  The falsity of Miyoko's "hormone free" claim is not

7    in dispute.  Miyoko's does not contend that its product contains no hormones in either its

8    Complaint or Motion for Preliminary Injunction.  Rather, Miyoko's claims that "consumers

9    understand" that Miyoko's is "merely emphasizing that it does not contain the controversial

10   animal hormones artificially injected into some milk-producing cows."  Complaint, ¶23.  But the

11   first step of *Central Hudson* does not contain an exception when the producer claims that its

12   customers already understand that the statement is untrue.

13        Miyoko's is subject to the same specific rule concerning the term "hormone free" as other

14   food producers.  The Department's position is that no producer may label a product as containing

15   no hormones when it contains hormones.  Beam Decl., ¶7–8 (describing labels stating "from

16   cows not treated with rBST").  It does not matter if the product is dairy or plant-based.  This

17   applies to milk and cheese producers who do not use "the controversial animal hormones"

18   injected into some animals.  California is not alone in the application of this ordinary rule.  *See*

19   *Int'l Dairy Foods Ass'n v. Boggs*, No. 2:08-CV-628, 2009 WL 937045, at *8 (S.D. Ohio Apr. 2,

20   2009), *aff'd in part, rev'd in part on other grounds*, 622 F.3d 628 (6th Cir. 2010) ("[T]he Ohio

21   rule bans terms such as "No Hormones", "bST free", or "Hormone Free." These phrases are false

22   because all dairy products contain some natural hormones. . . . those terms are not entitled to First

23   Amendment protection and this court need not address the remaining Central Hudson factors.);[7]

24   *see also* A. Bryan Endres, *United States Food Law Update: Consumer Protections and Access to*

25   *Information: rBST, BPA, the ADA and Color Additives*, 4 J. Food L. & Pol'y 263, 267 (2008)

---

26   [7] On appeal, plaintiff-appellants International Dairy Foods Association and Organic Trade
     Association conceded that the phrase "Hormone Free" was "misleading" as applied to milk from
27   cows not treated with added hormones.  Brief for Plaintiff-Appellants, *Int'l Dairy Foods Ass'n v.*
     *Boggs*, 622 F.3d 628 (6th Cir. 2010) (Nos. 09-3515, 09-3526) 2009 WL 3269470 at n. 15
28   (challenging Ohio regulation as overly broad).

1  (cataloging statements by FDA in guidance documents and warning letters rejecting "hormone

2  free" labels for products that contain naturally-occurring hormones).  No court or agency has

3  rejected a regulator's authority to prohibit use of the term "hormone free" on products containing

4  hormones.[8]  Miyoko's offers no reason for this Court to be the first and only tribunal to do so.

5        **B.**    **The Department's Adherence to Standards of Identity for Butter and**

6              **Margarine is Permissible Under the First Amendment**

7       California's consistent application of standards of identity satisfies the *Central Hudson*

8  test, whether considered at the threshold stage or whether evaluated as a narrowly tailored

9  restriction that directly advances a governmental interest.

10       The threshold inquiry under *Central Hudson* requires a finding that the statements at issue

11  are not misleading.  *Metro Lights*, 551 F.3d at 903 (quoting *Central Hudson*, 447 U.S. at 564–66).

12  Miyoko's calling this product "butter" is misleading because the product is not butter.  Federal

13  statutes and regulations define butter based on a history of ordinary usage, and Miyoko's product

14  does not satisfy those requirements for clear statements identifying a product.

15       Miyoko's own evidence shows that many customers are confused by existing products.  In

16  the Feltz study, attached to the Sawhney Declaration as Exhibit F (ECF No. 24-6 at 49–96), 26%

17  of subjects failed to recognize that vegan cream cheese was plant-based.  *See* ECF No. 24-6 at 50,

18  72 (showing 74% correct responses).  Survey recipients misidentified the vegan cream cheese

19  product more often than they misidentified any dairy product.[9]  Although this is not a direct test

20  of Miyoko's product, it demonstrates the misleading nature of advertising plant-based products by

21  the names of dairy products.  *See id.*  Application of standards of identity serves to avoid this sort

22  of misleading packaging.

23       Even if the Court finds that the package is not misleading, the Department satisfies the

24  remaining factors under the *Central Hudson* test.  There is no serious dispute concerning the

25          [8] Miyoko's analogizes its position concerning the term "hormone free" to using the term

26  "chemical free."  *See* Complaint, ¶23.  But no court has adopted the view that the term "chemical free" is protected either.  And the U.S. Department of Agriculture states that use of "[t]he term

27  [chemical free] is ***not allowed*** to be used on a label." U.S. Dept. of Agric., Meat and Poultry Labeling Terms (2015), https://perma.cc/XL2S-VRN7 (emphasis and brackets original).

        [9] The Feltz study did not test a vegan butter; vegan cream cheese is the closest analog in

28  the surveys.

1    second factor; the government has a substantial interest in regulation of advertising and marketing

2    to avoid customer confusion.  *See Duran v. Hampton Creek*, No. 3:15-cv-05497-LB, 2016 WL

3    1191685, at *1, *6 (N.D. Cal. Mar. 28, 2016) (recognizing California's interest in consumer

4    protection in consumer lawsuit alleging that vegan imitation mayonnaise titled "Just Mayo" was

5    mislabeled); *see also Pub. Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 225

6    (5th Cir. 2011) (acknowledging "substantial interest in preventing consumer confusion").  The

7    Supreme Court has repeatedly reaffirmed that "[t]he First Amendment . . . does not prohibit the

8    State from insuring that the stream of commercial information flow[s] cleanly as well as freely."

9    *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (quoting *Virginia State Bd. of Pharmacy v. Virginia*

10   *Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–72 (1976)).

11          Following standards of identity also satisfies the third and fourth factors, directly

12   advancing the government interest and tailoring the regulation to serve that interest.  Standards of

13   identity serve to prevent misleading or confusing speech.  Government enforcement of standards

14   of identity efficiently and consistently protects consumers from confusion, and "economic

15   adulteration"—where producers used different proportions of components in their products,

16   rendering them "inferior to that which the consumer expected to receive when purchasing a

17   product with the name under which it was sold."  *Fed. Sec. Adm'r v. Quaker Oats Co.*, 318 U.S.

18   218, 230 (1943) (citing legislative history).  "The provisions for standards of identity thus reflect

19   a recognition by Congress of the inability of consumers in some cases to determine, solely on the

20   basis of informative labeling, the relative merits of a variety of products superficially resembling

21   each other."  *Id.* at 230–31.  In the case of butter, margarine, and spreads, the Department follows

22   long-established standards, history of usage, and ordinary usage to inform generally applicable

23   rules.  *See* Beam Decl., ¶¶4, 7 & 12 (discussing 21 U.S.C. § 321a and 21 C.F.R. § 166.110).  The

24   federal standard of identity statute for butter, 21 U.S.C. § 321a, passed in 1923, and has since that

25   date defined butter as being made from milk or cream and containing 80% fat.

26          Miyoko's product fails to conform to standards of identity in two ways.  First, it is not

27   made from milk or cream.  Second, it appears that Miyoko's product is under 80% fat.  The

28   Department's policy is to create a level playing field where all products identified as butter satisfy

1   both requirements.  *See* Beam Decl., ¶¶7–10.  Applying the same rules across the market is a

2   priority for the Department.  *See id.* at ¶7.  Miyoko's vegan butter does not satisfy the rule and

3   permitting it to do so would allow one company to operate outside the framework applied to all of

4   Miyoko's competitors. Neutral application of this uniform standard is not viewpoint

5   discrimination.

6        When deciding how to narrowly tailor a regulation of commercial speech, the government

7   is well within its rights to consider the cost of different policy choices.  *See, e.g.*, *Show Media*

8   *California, LLC v. City of Los Angeles*, 479 F. App'x 48, 50 (9th Cir. 2012) (allowing

9   grandfathering of existing use so that city could avoid paying compensation for takings);

10  *Maldonado v. Morales*, 556 F.3d 1037, 1048 (9th Cir. 2009) (reaching same conclusion in strict

11  scrutiny analysis for equal protection challenge).  Here, the Department receives thousands of

12  labels submitted for approval each year.  Roughly 10% of those require a response from the

13  Department asking the company for revision.  Beam Decl., ¶11.  Given the volume of

14  applications and the interest in fair competition, the Department's approach is the best way to

15  apply a consistent rule to all products: margarine and spreads (containing dairy or plant-based)

16  cannot be identified as butter, and butter cannot be identified as margarine.

17       Miyoko's claims that plant-based alternatives are a fast-growing industry that needs to use

18  the dairy product term to inform customers what their product resembles.  Schinner Decl., ¶16.

19  According to Miyoko's, prohibiting it from calling its products by dairy product names puts a

20  thumb on the scale for butter against plant-based alternatives.  The problem with this story is that

21  even if it is true for milk, cheese, and meat, it is not true for butter.  Consumers are already

22  familiar with plant-based alternatives to butter.  They have been on the market for decades, called

23  margarine and spreads.  Consumers clearly had no difficulty ascertaining this, as butter use

24  declined beginning in the early 20th Century.  The volume of margarine sold exceeded the volume

25  of butter sold for nearly 50 years.  *See* Bentley & Ash, *supra*.  Miyoko's repeats this error when

26  comparing this case to several district court decisions.  *See* Mot. at 13:25–15:21.  Each of these

27  cases concerns either milk or meat, not butter.  Neither milk nor meat has a plant-based analog as

28  well-known as margarine.

Miyoko's points to products like peanut butter and fruit butter, claiming that its product is analogous. *See* Mot. at 16:8–9. The Department's position toward nut and fruit butters follows from federal standards of identity for those products—standards that differ from butter. *See* Beam Decl., ¶16 (discussing Peanut Butter, 21 CFR §§ 164.110 (first promulgated by Tree and Peanut Products, 42 Fed. Reg. 14,475 (March 15, 1977)), Fruit Butter, 21 C.F.R. § 150.110 (first promulgated by Fruit Butter, 42 Fed. Reg. 14,445 (March 15, 1977)). Both peanut butter and fruit butter taste nothing like dairy butter, are used differently than dairy butter, and have a long history of common usage. The federal standards of identity for nut and fruit butters reflect the recognition that because of their history of common usage, fruit and nut butter labels will not be misleading to consumers looking for dairy butter. Miyoko's product is more analogous to a mayonnaise without egg. That product, called "Just Mayo," was the subject of *Duran v. Hampton Creek*. *See* 2016 WL 1191685 at *1, *6 (denying motion to dismiss because plaintiff was plausibly confused by "Just Mayo" product that did not contain egg, a traditional ingredient in mayonnaise). There, as here, the vegan product is a direct substitute for the non-vegan product.

There is no daylight between the Department's position on butter and the federal standard of identity codified in 1923. Although Miyoko's Motion does not admit as much, the relief Miyoko's seeks would require this Court to disregard the federal statutory framework and order California to act contrary to a system designed to promote uniform rules and fair competition. The First Amendment does not compel the abolition of standards of identity for foods.

## C. The Department is Correct to Require Miyoko's to Remove Statements Associated with Dairy Products from Its Package

The third category of violations by Miyoko's concerns a set of terms that raise the risk that its product will be confused for a dairy product. In doing so, the Department followed federal regulations—regulations that the Department has no discretion to modify. *See* ECF No. 1-1 (citing 21 C.F.R. §§ 101.18, 102.5, and 130.8). Although Miyoko's claims that its consumers understand that it is not a dairy product, *see* Complaint, ¶¶23, 33, Miyoko's package pronounces that the product is "Lactose Free," "Cruelty Free," and "Revolutionizing Dairy with Plants." The term "hormone free," in addition to being impermissible because it is untrue, contributes to

1   potential confusion when used in concert with these other terms.  According to Miyoko's, the

2   terms "Lactose Free" and "Cruelty Free" are necessarily true statements about their plant-based

3   product.  In other words, the statements are superfluous marketing.  But on a dairy product these

4   terms would signify that it is a specialty product.  Miyoko's is a new entrant to a market for non-

5   dairy alternatives to butter.  A shopper who sees those phrases, combined with "Revolutionizing

6   Dairy with Plants" in large print, knowing that non-dairy substitutes have been sold for decades,

7   could misunderstand the label and believe that Miyoko's has changed how dairy products are

8   made by adding plants to a dairy product.  *Cf. Revolutionize*, Merriam-Webster.com Dictionary

9   (2020) ("3. to change fundamentally or completely"), *Revolution*, Black's Law Dictionary (11th

10  ed. 2019) ("2. A complete change in ways of thinking or methods of doing things.").

11      Miyoko's own evidence is illustrative here as well.  The Feltz study showed that 26% of

12  respondents failed to identify vegan cream cheese as plant-based.  *See* Sawhney Decl., Exh. F

13  (ECF No. 24-6 at 50, 72 (showing 74% correct responses).  Like Miyoko's product, the test

14  product, Daiya Plain Cream Cheese Spread, displayed dairy-associated statements, including

15  "lactose free."  *Id.* at 77.  Miyoko's package creates risks of confusion similar to a package that

16  caused more than 1 in 4 test subjects to misidentify it.



23      Like the use of the term "butter," the Department's response to the combined use of dairy-

24  related descriptions justifies the restrictions at both the first/threshold and third/fourth steps of the

25  *Central Hudson* test.  Because the combined language is misleading, First Amendment protection

26  does not apply.  And even if it did, the state's application of federal rules is an appropriate

27  approach, not viewpoint discrimination.

1    **III.   MIYOKO'S DOES NOT FACE IMMINENT OR IRREPARABLE HARM**

2         Miyoko's alleges two categories of harm.  First, if the Department moves forward with

3 enforcement against the vegan butter package, would suffer constitutional injury from not being

4 able to convey its message.  Second, Miyoko's claims that it has already censored other speech

5 out of fear that the Department will restrict that speech.  Neither is a basis for preliminary relief.

6       **A.   Miyoko's Alleged Constitutional Harm is Not Imminent**

7         Miyoko's vegan butter is on store shelves with the package the Department objected to

8 over six months ago.  Miyoko's has not self-censored this package.  ECF No. 33 at 6:20–21.

9 Miyoko's claim to injury directly related to this package is prospective—that the Department may

10 in the future move forward with enforcement.  But preliminary relief requires that the threatened

11 injury be "immediate."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

12 1988).  Where there are "multiple contingencies" before injury, the injury is not immediate.  *Id.* at

13 675 (citing *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d

14 231, 233 (9th Cir. 1980)).  Currently, if the preliminary injunction is not granted, there would be

15 no immediate change to Miyoko's position—its misbranded product would still be available in

16 stores.  As discussed in the briefing and argument concerning standing, ECF Nos. 17, 26, the

17 Department's procedures provide for review of its position, at least two additional warnings, and

18 a minimum of 60 days before the Department could move forward with impoundment of product.

19 *See* Declaration of Dr. Stephen Beam in Support of Defendants' Motion to Dismiss (ECF No. 17-

20 2), ¶6.  Given this lack of immediacy, constitutional injury arising directly from the vegan butter

21 product does not satisfy the requirement for *immediate* irreparable harm.[10]

22       **B.   Miyoko's Self-Censorship in Other Contexts is Not Redressable by This Motion**

23

24         Miyoko's second injury claim is self-censorship in other advertising and marketing.  Mot.

---

25       [10] Miyoko's claim that it needs preliminary relief in California, despite no immediate risk, is striking when compared to its experience in Wisconsin.  There, unlike California, the state

26 compelled stores to not sell Miyoko's "vegan butter" using the current label.  In 2019, Miyoko's accommodated the state by adding a sticker identifying its product as a "vegetable spread."  *See*

27 Nicole Axworthy, *Wisconsin Department of Agriculture Orders Removal of Miyoko's Vegan Butter from Store Shelves*, VegNews (June 20, 2019) https://perma.cc/4YJY-5DTJ.  Miyoko's

28 accommodation in Wisconsin also casts doubt on the claim in paragraph 16 of the Schinner Declaration that Miyoko's would have to change all labels nationwide.

---

1    at 21:21–22:27.  This may be immediate, but this Motion cannot fix it.  A plaintiff seeking a

2    preliminary injunction must demonstrate that the challenged conduct will cause irreparable harm,

3    and that the injunction would redress the harm.  *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d

4    976, 982 (9th Cir. 2011) (requiring "sufficient causal connection between irreparable harm" and

5    the conduct to be enjoined).  Miyoko's claims it self-censored in part because of the December 9

6    letter, but also because of a perceived pattern of improper targeting of vegan businesses and risk

7    that the Department would retaliate against Miyoko's if it engaged in political debates about

8    animal agriculture and COVID-19.  *See* Cohen Decl., ¶11.  The requested relief would not

9    address these concerns.  And Miyoko's cannot obtain a declaration of relevant rights in a

10   preliminary injunction.  *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("prior to final

11   judgment there is no established declaratory remedy comparable to a preliminary injunction").

12        Moreover, Miyoko's self-censorship in other contexts does not justify injunctive relief

13   because it relies on speculation and caricature of the Department that is unsupported by evidence.

14   Miyoko's only evidence of unfair targeting is second-hand and lack verifiable details.  Its

15   supporting declarations contain no examples of identifiable companies or products.  The one

16   example in their brief, concerning The Cultured Kitchen, draws on a law review article, which

17   cites privately-held interview notes as its main sources.  In fact, The Cultured Kitchen presented a

18   serious public health concern as the source of a salmonella contamination, which in turn required

19   a response by the Department.  *See* Press Release, Cal. Dep't of Pub. Health, CDPH Warns Not to

20   Eat the Cultured Kitchen's Cashew Cheese Products Due to Health Risk (Dec. 31, 2013),

21   http://perma.cc/336L-XRD9.  When viewed in light of statutes and regulations that constrain the

22   Department's conduct, even Miyoko's hearsay shows nothing more than the Department applying

23   long-established rules.  And there is no evidence that the Department has or would retaliate

24   against a private party because of political speech.

25   **IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PERMITTING THE
             DEPARTMENT'S CONSUMER PROTECTION REGULATION**

26

27        Miyoko's is not the only party to this dispute that may face irreparable injury based on the

28   outcome of this Motion.  "[A]ny time a State is enjoined by a court from effectuating statutes

15

1    enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor*

2    *Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977 (Rehnquist, J., in

3    chambers), *see Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in

4    chambers) (same). "A more rigorous standard [for preliminary injunctions against the

5    government] 'reflects the idea that governmental policies implemented through legislation or

6    regulations developed through presumptively reasoned democratic processes are entitled to a

7    higher degree of deference and should not be enjoined lightly.'" *Smith v. Reiskin*, No. 4:18-cv-

8    01239-JSW, 2018 WL 7820727, at *2 (N.D. Cal. Oct. 10, 2018) (quoting *Planned Parenthood*

9    *Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008)).

10          Here, the Department primarily seeks the power to enforce democratically enacted

11    statutes. *See* 21 U.S.C. § 321a (federal standard of identity for butter), Cal. Food & Agric. Code

12    § 39521 (state standard of identity for spreads). It also seeks the power to enforce regulations

13    promulgated under state and federal statutes. The public interest also overlaps with the specific

14    governmental interest: regulation to prevent against misleading and confusing marketing. *See*

15    *Zauderer*, 471 U.S. at 651, *Duran*, 2016 WL 1191685, at *6. Absent a strong showing that

16    Miyoko's will prevail on the merits of its First Amendment claim, the balance of hardships and

17    public interest favor permitting the Department to carry out its responsibilities.

18                                                **CONCLUSION**

19          Because Miyoko's is not lawfully entitled to use its present package, no injunction should

20    restrain the Department of Food and Agriculture from enforcing applicable laws.

21

22    Dated: July 16, 2020                                    Respectfully Submitted,

23                                                            XAVIER BECERRA
                                                             Attorney General of California
24                                                            MYUNG J. PARK
                                                             Supervising Deputy Attorney General
25

26                                                            */s/ Michael S. Dorsi*
                                                             MICHAEL S. DORSI
27    SF2020200476                                            Deputy Attorney General
      42270817.docx                                          *Attorneys for Defendants*
28