UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIYOKO'S KITCHEN,

        Plaintiff,

     v.

KAREN ROSS, et al.,

        Defendants.

Case No. 20-cv-00893-RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## I. INTRODUCTION

In December 2019, plaintiff Miyoko's Kitchen ("Miyoko's") received a letter ("the Letter") from the California Department of Food and Agriculture ("the Department"). The Letter informed Miyoko's that a particular label for its "vegan butter" product, as well as certain marketing content on its website, ran afoul of state and federal law, and ordered the company to bring itself into compliance. Miyoko's responded by bringing this as-applied First Amendment challenge against defendants Karen Ross, in her official capacity as the Secretary of the Department, and Stephen Beam, in his official capacity as Milk and Dairy Food Safety Branch Chief (collectively, "the State"). Having survived the State's motion to dismiss, Miyoko's now moves preliminarily to enjoin the State from taking any enforcement action relating to the Letter or its demands. The State opposes, arguing that the speech at issue does not enjoy sufficient First Amendment protection to withstand important regulatory interests. For the reasons explained herein, Miyoko's motion is granted as regards the phrases "butter," "lactose free," and "cruelty free," and denied as regards the materials on its website and the phrases "hormone free" and

United States District Court
Northern District of California

"revolutionizing dairy with plants."

## II. BACKGROUND

### A. Miyoko's Kitchen

Miyoko's produces and sells a variety of plant-based, vegan products which are designed to resemble dairy products in appearance and taste. The company markets its foods using names that reference the products' more common dairy analogues, such as a "vegan butter" and "vegan cheese." These dairy references are always preceded by conspicuous terms such as "vegan" or "plant-based." In the company's view, the labelling of Miyoko's products leaves no room for doubt among consumers that these are fundamentally different items than their dairy counterparts, in that they are not actually dairy.

Miyoko's sells its products in more than 12,000 stores in the U.S. and Canada, enjoying a presence in established grocery chains such as Safeway, Whole Foods, and Trader Joe's. According to the company's founder, Miyoko Schinner, it is a mission-driven business, dedicated to "the creation of a humane, healthy, and sustainable food supply" and to "ending animal cruelty and reducing climate change caused by animal agriculture." Decl. of Miyoko Schinner, Dkt. 23-1 at 3. To that end, Schinner and her husband also run a non-profit animal sanctuary in Marin County, California, and an image of a sanctuary volunteer petting a rescued cow features prominently on Miyoko's website. *Id.*

### B. State and Federal Law as Applied to Miyoko's Kitchen

California law directs the Department to review food labelling for compliance with federal law. *See* Cal. Food & Agric. Code § 32912.5 (specifically directing as much "in connection with advertising and retail sales of milk, . . . dairy products, cheese, and products resembling milk products"). As pertains here, federal law forbids a retailer from selling "misbranded" food items (that is, items with "labelling [that] is false or misleading"), food items "offered for sale under the name of another food," and food items that, though "purport[ing] to be or . . . represented as a food for which a definition and standard of identity" exists, do not "conform to such definition and standard . . . ." 21 U.S.C. § 343. For nearly a century, the standard of identity for butter has

1   required a product "made exclusively from milk or cream, or both . . . and containing not less than

2   80 per centum by weight of milk fat." 21 U.S.C. § 321a.

3       On December 9, 2019, Miyoko's received written notice from the Department's Milk and

4   Dairy Foods Safety Branch indicating the label for its "Cultured Vegan Plant Butter" failed to

5   comply with this regulatory framework.  Noting that "the product is not butter" and may not imply

6   it is "a dairy food without [traditional dairy] characteristics," the Letter instructed Miyoko's to

7   remove five terms from the product's label: "butter," "lactose free," "hormone free," "cruelty

8   free," and "revolutionizing dairy with plants." The Letter also objected to the display of the animal

9   sanctuary imagery and the phrase "100% dairy and cruelty free" on Miyoko's website, stating

10  "[d]airy images or associating the product with [agricultural] activity cannot be used on the

11  advertising of products which resemble milk products." Taken together, these directives present a

12  meaningful threat to Miyoko's on two fronts. Financially, obeying the Letter may carry up to two

13  million dollars in labelling and marketing costs; foundationally, compliance could result—and as

14  Miyoko's employees allege, already has resulted—in the chilling of speech around vegan-oriented

15  causes, the promotion of which the company sees as both its brand and animating purpose.

16      Approximately two months after receiving the Letter, Miyoko's brought suit

17  under the First Amendment, seeking declaratory and injunctive relief from the State's

18  legal interpretation as applied to Miyoko's vegan butter. Whereas the State has

19  determined the product's marketing and labelling to be false and misleading, Miyoko's

20  insists its references to butter are qualified by conspicuous language making clear to

21  consumers that the product is *not,* in fact, regular dairy-based butter. Miyoko's thus

22  contends that the State's enforcement posture, as captured in the Letter, violates the

23  company's constitutionally secured right to engage in truthful commercial speech.

24      Miyoko's now seeks a preliminary injunction prohibiting the State from taking

25  any enforcement action based on the Letter. The State's rebuttal emphasizes two

26  propositions. First, that the contested commercial speech is misleading, and therefore

27  beyond the First Amendment's protective scope; and second, that any protection the

28

ORDER GRANTING IN PART PL.'S MOT. FOR PRELIMINARY INJUNCTIVE RELIEF
CASE NO. 20-cv-00893-RS

3

1   speech might enjoy must yield to the State's interest in regulating food sales and

2   safeguarding consumers.

3                                   **III. LEGAL STANDARD**

4          To obtain preliminary injunctive relief, the moving party bears the heavy burden

5   of demonstrating that "he is likely to succeed on the merits, that he is likely to suffer

6   irreparable harm in the absence of preliminary relief, that the balance of equities tips in

7   his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def.*

8   *Council,* 555 U.S. 7, 20 (2008). Alternatively, if the moving party can demonstrate the

9   requisite likelihood of irreparable harm and show that an injunction is in the public

10  interest, a preliminary injunction may issue so long as there are "serious questions going

11  to the merits and the balance of hardships tips sharply in the moving party's favor."

12  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011) (internal

13  quotation marks and citations omitted).

14                                    **IV. DISCUSSION**

15         Because a plaintiff's likelihood of success on the merits "is a threshold inquiry,"

16  when a plaintiff fails to show that likelihood a court "need not consider the remaining

17  *Winter* elements." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal

18  quotation marks and citations omitted). While it is Miyoko's burden to prove that

19  likelihood at this fledgling stage of the controversy, both parties agree that the merits of

20  Miyoko's as-applied constitutional challenge ultimately turn upon the four-part test for

21  analyzing restrictions on commercial speech set out by the Supreme Court in *Central*

22  *Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557

23  (1980).

24         Under that test—often (and accurately) characterized as a form of intermediate

25  constitutional scrutiny—a court must first decide if the contested commercial speech

26  even enjoys First Amendment protection, which does not attach unless "the

27  communication is neither misleading nor related to unlawful activity." *Id.* at 564.

28

Assuming the speech is protected, any governmental restriction on it survives only if "(2) the State . . . assert[s] a substantial interest to be achieved by [the] restriction; (3) the restriction . . . directly advance[s] the state interest involved; and (4) [the restriction] . . . is not more extensive than is necessary to serve that interest." *Metro Lights, LLC v. City of Los Angeles,* 551 F.3d 898, 903 (9th Cir. 2009) (citing *Central Hudson*, 447 U.S. at 564-66) (internal quotation marks omitted).

The disputed speech on the label[1] of Miyoko's vegan butter product falls into three categories: the term "hormone free," the word "butter," and a trio of phrases highlighting the distinction between the product and its dairy counterpart—"lactose free," "cruelty free," and "revolutionizing dairy with plants." While the State does not defend to a satisfactory degree its power to regulate "butter," "lactose free," and "cruelty free," Miyoko's comes up short of proving its use of "hormone free" and "revolutionizing dairy with plants" is subject to constitutional protection in the first place. Each category is addressed in turn.

### A. "Hormone Free"

The parties do not seriously disagree about the truthfulness of Miyoko's "hormone free" claim: because plants contain naturally-occurring hormones, and because

---

[1] Since this suit was filed, the State has withdrawn its objections to the image of a woman petting a cow and the phrase "100% dairy and cruelty free" on Miyoko's website. This withdrawal followed the State's determination that the objections had been erroneous as a matter of California law, in that the Department's authority to regulate that specific speech (i) requires the promulgation of an attendant regulation, and (ii) only applies to physical packaging. *Compare* Withdrawal of Position, Dkt. 37, *with* Cal. Food & Agric. Code § 38955 (providing that "[o]n the *labels* of imitation milk products the use of pictures and symbols depicting dairy or agricultural activities . . . and [the] use of dairy or agricultural terms or words . . . shall be subject to restriction or prohibition by the director *by regulation*") (emphases added).

Proceeding on the understanding that the Department's conclusion as to its lack of authority under "the relevant statute" was not just artful wording—but rather, a good faith concession that it was genuinely unaware of *any* statute conferring such authority—the Letter's rescinded demands no longer confront Miyoko's with the sort of "immediate threatened injury" that is "a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldridge,* 844 F.2d 668, 674 (9th Cir. 1988). The portion of Miyoko's motion trained on enjoining the State from action related to those demands is accordingly denied.

United States District Court
Northern District of California

Miyoko's vegan butter is made of plants, it necessarily contains hormones as well. That the claim is literally false places it beyond the bounds of protected commercial speech, fatally undermining Miyoko's right to use it without fear of reprisal. *See, e.g. Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 638 (observing the "well-settled" rule that "false" commercial speech fails the first step of *Central Hudson*).

Miyoko's struggles to escape this result by reference to its prototypical consumer, who allegedly "understands that the phrase . . . in context with other phrases [on the label] . . . mean[s] that the company's vegan butter does not contain the artificial hormones that are sometimes added to animal-based dairy products." Pl.'s Reply, Dkt. 43 at 7. While there is something to be said for the connection a brand forges with its customers, this reasoning takes that concept a step too far. *Central Hudson* insists, at the threshold, that commercial speech be true, and provides no exception for falsities made true by the target consumer's supposed contextual awareness. Indeed, as the State persuasively points out, no court has ever repudiated a regulator's authority to demand that products claiming to lack hormones actually lack hormones. *See, e.g. Int'l Dairy Foods Ass'n v. Boggs,* WL 937045, at *8 (S.D. Ohio Apr. 2, 2009), *aff'd in relevant part,* 622 F.3d 628 (6th Cir. 2010). Against this backdrop, Miyoko's insistence that it would be "illogical for any consumer to believe" that a product labelled "hormone free" does not contain hormones falls decidedly flat. Pl.'s Reply, Dkt. 43 at 7-8. Neither, for that matter, is Miyoko's aided by its curious attempt to distinguish the regulation of hormone claims in milk from hormone claims in butter, an argument squarely contradicting the one advanced by the company for every other phrase at issue in this action. Because its plant-based butter is not "hormone free," there is no merit to Miyoko's request for license to label it with that term.

**B. "Butter"**

**1. Miyoko's Likelihood of Satisfying the First *Central Hudson* Factor**

United States District Court
Northern District of California

1    Beginning, as is appropriate when a word's significance is up for debate, with the

2    dictionary, "butter" is defined as (1) "a solid emulsion of fat globules, air, and water

3    *made by churning milk or cream* and used as food," and (2) "a buttery substance,"

4    including (a) "any of various fatty oils remaining nearly solid at ordinary temperatures"

5    or (b) "*a creamy food spread*[,] especially [] one made of roasted nuts . . . ." *Butter,*

6    Merriam-Webster Online, https://www.merriam-webster.com /dictionary/butter

7    (emphases added). Predictably, Miyoko's stresses this secondary definition, and

8    reinforces its position with the long, uncontroversial history of common usage for phrases

9    like "peanut butter" and "apple butter." The government parries with a history of its own:

10   since 1923, the Food, Drug & Cosmetic Act has mandated that "'butter' shall be

11   understood to mean the food product usually known as butter, which is made exclusively

12   from milk or cream . . . [and] contain[s] not less than 80 per centum by weight of milk fat

13   . . . ." 21 U.S.C. § 321a.

14   Setting aside, for the moment, the circular logic of the State's position, neither

15   party's definitional approach proves dispositive. The question thus remains: is Miyoko's

16   use of the word "butter," in immediate or close proximity to terms like "vegan," "made

17   from plants," "cashew cream fermented with live cultures," and "cashew & coconut oil

18   spread,"[2] misleading commercial speech? For three reasons, the State—which, as "the

19   party seeking to uphold a restriction on commercial speech," bears the final "burden of

20   justifying [the restriction]"—does not overcome Miyoko's contention that it is not.

21   *Edenfield v. Fane,* 507 U.S. 761, 770 (1993).

22   *First*, courts querying the product names of other plant-based "alternative" foods

23

---

24   [2] Aside from the brand name, "butter" is the most prominent word on the front of the label for
     Miyoko's vegan butter product. It is directly preceded by "European style cultured vegan" and
25   directly followed by "made from plants" (each in smaller text), producing the phrase "European
     style cultured vegan butter made from plants" on the label's upper-right quadrant. "Cashew cream
26   fermented with live cultures" appears in even smaller text on the middle of the label's bottom-left
     quadrant, and the font size of "cashew & coconut oil spread," on the very bottom-left corner, is
27   tinier still.

28

1    generally have not found those names misleading. In damages suits brought by individual

2    consumers under the California Unfair Competition Law, for instance, trial judges of this

3    district have held "it is simply implausible that a reasonable consumer would mistake a

4    product like soymilk or almond milk with dairy milk from a cow," and that "even the

5    least sophisticated consumer[] does not think soymilk comes from a cow." *Ang v.*

6    *Whitewave Foods Co.,* 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013) ("agree[ing]

7    with Defendants that the names 'soymilk,' 'almond milk,' and 'coconut milk' accurately

8    describe Defendants' products"); *Gitson v. Trader Joe's Company*, 2015 WL 9121232, at

9    *1 (N.D. Cal. Dec. 1, 2015) (declining any suggestion that "the word 'soymilk' is

10   misleading" in that "it implies the product has a similar nutritional content to cow's milk"

11   because the same unsophisticated consumer "would not assume that two distinct products

12   have the same nutritional content; if the consumer cared about the nutritional content, she

13   would consult the label"). The Ninth Circuit has affirmed this reasoning. *Painter v. Blue*

14   *Diamond Growers,* 757 F. App'x 517, 519 (9th Cir. 2018). Likewise, and in the more

15   pertinent First Amendment setting, an Arkansas district court recently rejected that state's

16   framing of commercial speech as misleading where the label of plant-based "meat"

17   products "include[d] ample terminology to indicate [their] vegan or vegetarian nature . . .

18   ." *Turtle Island Foods SPC v. Foman*, 424 F. Supp. 3d 552, 574 (E.D. Ark. 2019).

19        Against this, the State offers one alternative-mayonnaise case.[3] In *Duran v.*

20   *Hampton Creek,* the court ruled a consumer fraud plaintiff's complaint sufficiently

21   plausible based principally on the labelling of an eggless mayonnaise. 2016 WL 1191685,

22   at *1 (N.D. Cal. Mar. 28, 2016). Yet—and as the State neglects to mention—crucial to

23

24   [3] The State summons this case on the heels of articulating why butter is *sui generis*, because
     "[n]either milk nor meat has a plant-based analog as well-known as margarine." Defs.' Opp'n,
25   Dkt. 38 at 11. This premise is difficult to believe in light of the current prevalence of products like
     "soymilk," "almond milk," and "coconut milk," *see e.g. Ang,* 2013 WL 6492353, at *3 (noting the
26   U.S. Food & Drug Administration's regular use of the word "soymilk" in official statements), and
     the absence of any authority to support it severely undercuts the State's theory that mayonnaise-
27   related cases are somehow more instructive than those involving milk, or meat.

United States District Court
Northern District of California

that ruling was the uniquely unrepresentative label of the product in question, which consisted almost entirely of the phrase "Just Mayo" and the picture of an egg, without any accompanying qualifiers such as "vegan" or "made from plants." *Duran,* 2016 WL 1191685, at \*2. No like facts are alleged here.

*Second*, the State's showing of broad marketplace confusion around plant-based dairy alternatives[4] is empirically underwhelming. To bolster its claim that a given business practice is deceptive, a regulatory body is, of course, invited to present academic studies to that effect. *Edenfield,* 507 U.S. at 771. The State's efforts to that end, however, do not suggest that any such research exists. The briefing for this motion only engages a single academic report, introduced by Miyoko's in support of the idea that plant-based dairy replacements do not, as a general matter, misdirect or confuse the average consumer. *See* Feltz Study, Dtk. 24-6, at 50. That study indicates, in relevant part, that the public "accurately identifie[s] the source of animal-based milk products 84% of the time, plant-based milk-products 88% of the time, animal-based cheese products 81% of the time, and plant-based cheese products 74% of the time." *Id.* Hoping to turn this data against its proponent, the State makes hay of the 74% figure—or, more accurately, of the 26% consumer-confusion rate it necessarily describes. This is, to put it mildly, a blinkered interpretation. Adopting the State's preferred metric, 26% of the study's participants were indeed confused by plant-based cheeses—but a full 19% were *also* confused by animal-based cheeses. Conversely, while 12% of respondents misidentified plant-based milks, 16% misidentified animal-based milks. Taken as a whole, this research merely signals the following: that consumers are perhaps a bit better at identifying traditional cheeses than vegan cheeses, and perhaps a (roughly equivalent) bit better at identifying vegan milks than traditional milks. For the purposes of First Amendment

---

[4] As distinct from any as-applied evidence the State might put forward regarding how Miyoko's vegan butter particularly confuses California shoppers. *See* Discussion Part B.2, *infra.*

scrutiny, this modest takeaway hardly cuts in favor of finding Miyoko's use of "butter" inherently misleading.

*Finally,* justifying governmental speech regulation using the government-issued dictionary is troublingly self-fulfilling. As the Eleventh Circuit has forcefully observed, though "[i]t is undoubtedly true that a state can propose a definition for a given term . . . it does not follow that once a state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading. Such a per se rule would eviscerate *Central Hudson . . . .*" *Ocheesee Creamery v. Putnam,* 851 F.3d 1228, 1238 (11th Cir. 2017). While non-determinative, this consideration does occasion a more searching review of the State's reliance on distinctions of its own creation. In the State's central thesis, Miyoko's product does not meet the federal standard for "butter" (which it cannot be called without dairy and an 80% fat content), barely evades being "margarine" (which it would have to be called if it was slightly fattier), and ought to be sold as a "spread" (non-enforcement around peanut-and-fruit-based "butter" notwithstanding).

To the degree this arrangement reflects identifiable linguistic norms, it embodies a substantially credible assertion of regulatory power over commercial speech; but without that indicia, the government's opinion of what words mean is not, by itself, especially compelling. Because, as discussed above, the State's view of "butter" stands largely by itself—unanchored by precedent, empirical research, or any other form of independently authoritative ballast—it does not disturb the weight of evidence tending to show that Miyoko's use of that word is likely not misleading. In this early phase of the litigation, it therefore appears Miyoko's decision to label its product as "butter" is entitled to First Amendment protection.

### 2. Miyoko's Likelihood of Satisfying the Remaining *Central Hudson* Factors

Miyoko's succeeds under factors two through four of *Central Hudson.* True, the State asserts, in the abstract, "a substantial interest to be achieved by . . . restriction[s]"

aimed against customer confusion. *Central Hudson,* 447 U.S. at 564. Nor, for argument's sake, is it immediately clear that the choice to reserve certain terms for foods of a certain compositional makeup is, in the abstract, "more extensive than is necessary to serve that interest." *Id.* at 566. The problem is with how "the restriction . . . directly advance[s] the state interest involved." *Metro Lights,* 551 F.3d at 903.

To sustain its "butter" ban in this action, the State eventually "must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield,* 507 U.S. at 771 (citations omitted). In the narrow context of an as-applied constitutional challenge, the State might satisfy this requirement with a moderate showing of the ban's tendency to redress harms caused by Miyoko's vegan butter in particular, if not the dairy-alternative market writ large. There is, on this record, no such showing to be found. Nowhere, for instance, does the State present testimony from a shopper tricked by Miyoko's vegan butter, or otherwise make the case for why Miyoko's substitute spread is uniquely threatening to the public weal. This omission makes it exceedingly difficult to ascertain the *advancement* of a legitimate governmental interest, to *any* degree, resulting from a proscription of Miyoko's practice of labelling its spread "butter."[5] It is consequently likely the company will prevail on this score by operation of the remainder of *Central Hudson*.

### C. "Lactose Free," "Cruelty Free," and "Revolutionizing Dairy with Plants"

Turning to "lactose free" and "cruelty free," the parties apparently agree that both claims are literally true:[6] but that alone does not trigger First Amendment protection. To

---

[5] Strumming this chord to decidedly more dramatic effect, Miyoko's dedicates appreciable time and energy to the State's purported role in a dairy-sponsored conspiracy against vegan food producers. Though the hearsay comprising much of this narrative may, as the State points out, be taken into account for the purposes of a preliminary injunction, it need not be given weight where, as here, it does not seem particularly reliable. *See* Order Denying Mot. to Dismiss, Dkt. 33 at 2 n.1. In any event, this "conspiracy" story—whatever its weighting—does not bear on the outcome of this order.

[6] The moving papers are silent on any "cruelty" implicated in the manufacture and sale of Miyoko's vegan butter.

pass muster under the first prong of *Central Hudson*, these terms, printed in quasi-close proximity[7] to "vegan butter," must additionally be cleared of any role in the creation or maintenance of a deceptive inference. *See Sears, Roebuck & Co v. F.T.C.*, 676 F.2d 385, 395 (9th Cir. 1982) (bringing "inference and pragmatic judgment" to bear on the application of *Central Hudson*) (internal quotation marks and citation omitted). For its part, Miyoko's endeavors to show no such inference exists by highlighting the numerous phrases on its label that point in an unmistakably non-dairy direction: "vegan," "made from plants," "cashew cream fermented with live cultures," and "cashew & coconut oil spread." The State—as with "butter"—produces little by way of rebuttal, resorting once more to the Feltz study to justify its restrictions of "dairy-related descriptions" at not only the constitutional threshold, but also "the third/fourth steps of the *Central Hudson* test." Defs.' Opp'n, Dkt. 38 at 13. As with "butter," this strategy asks more of "26%" than the figure can bear. Without more to suggest that using "lactose free" and "cruelty free" as Miyoko's does is facially deceptive—or that the Department forestalls some specific harm by barring this specific instance of that usage—Miyoko's appears poised to win its fight to retain those terms on its label.

Not so for "revolutionizing dairy with plants." Returning to the dictionary, to "revolutionize" an industry requires "chang[ing] it fundamentally or completely." *Revolutionize,* Merriam-Webster Online, https://www.merriam-webster.com /dictionary/butter. "Revolutionizing dairy" thus denotes direct interaction with animal-based milk products in a way that leaves them "fundamentally" different than they were before. Put simply, this is not at the core of what Miyoko's—a maker of dairy *replacements*—does or seeks to do. Just like the statement that a vegan clothier's motorcycle jackets "revolutionize leather with cotton," or that a maker of non-alcoholic

---

[7] These phrases appear on the side of the product's label. "Revolutionizing dairy with plants" appears on the back.

United States District Court
Northern District of California

beverages "revolutionizes whiskey with seltzer," this claim of Miyoko's is plainly

misleading.[8] The State should not be enjoined from responding to its presence in the

marketplace with appropriate regulatory action.

### D. Irreparable Harm, the Balance of Equities, and the Public Interest

Although likelihood of success on the merits is the first hurdle on the path to

preliminary injunctive relief, Miyoko's still must demonstrate that the governmental

action it seeks to avoid threatens irreparable harm, and that both the balance of hardships

and public interest counsel for relief. Helpfully, binding First Amendment precedent

makes quick work of these issues.

With respect to irreparable harm, "[a] party seeking preliminary injunctive relief

in a First Amendment context can establish irreparable injury . . . by demonstrating the

existence of a colorable First Amendment claim," *CTIA – The Wireless Association v.*

*City of Berkeley,* 928 F.3d 832, 851 (9th Cir. 2019) (internal quotation marks and

citations omitted); with respect to the weight of equities, "the fact that" a Plaintiff has

"raised serious First Amendment questions compels a finding that . . . the balance of

hardships tips sharply in Plaintiff['s] favor," *American Beverage Association v. City &*

*County of San Francisco,* 916 F.3d 749, 758 (9th Cir. 2019) (internal bracketing,

quotation marks, and citation omitted); and with respect to social good, "it is always in

the public interest to prevent the violation of a party's constitutional rights," *id.* (internal

quotation marks omitted). Concerning "butter," "lactose free," and "cruelty free,"

Miyoko's is accordingly entitled to preliminary injunctive relief.

### V. CONCLUSION

Consistent with the foregoing, the State is preliminary enjoined from any

enforcement action relating to the Letter or its demands insofar as they implicate the

word "butter" and the phrases "lactose free" and "cruelty free." Miyoko's petitions

---

[8] Tellingly, Miyoko's does not try to rebut the State's definitional critique.

regarding the terms "hormone free" and "revolutionizing dairy with plants" are denied.

After consultation with the parties and as is appropriate on the facts of the case, no

security shall be required of Miyoko's in conjunction with this relief.

**IT IS SO ORDERED**.


Dated: August 21, 2020

_____

RICHARD SEEBORG
United States District Judge