XAVIER BECERRA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL S. DORSI
Deputy Attorney General
State Bar No. 281865
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3802
 Fax:  (415) 703-5480
 E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Defendants*
*Special Fund*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MIYOKO'S KITCHEN,**<br><br>                                        Plaintiff,<br><br>            v.<br><br>**KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and STEPHEN BEAM, in his official capacity as Branch Chief of the Milk and Dairy Food Safety Branch,**<br><br>                                        Defendants. | 3:20-cv-00893-RS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:            February 4, 2021<br>Time:            1:30 p.m.<br>Courtroom:    3[1]<br>Judge:          Honorable Richard Seeborg |

---

[1] Defendants are aware that, in accordance with Northern District of California General Order No. 72, the Court will not hold oral in-person argument and will hold a telephonic or videoconference argument if the judge determines that a hearing is necessary.

1  TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

2       PLEASE TAKE NOTICE that on February 4, 2021, at 1:30 p.m., or as soon thereafter as

3  they may be considered,[2] Defendants Karen Ross, in her official capacity as Secretary of the

4  California Department of Food and Agriculture, and Stephen Beam, in his official capacity as

5  Branch Chief of the Milk and Dairy Food Safety Branch will and do move for summary judgment

6  against all claims by Miyoko's Kitchen, Inc., or in the alternative for partial summary judgment

7  on all claims where the Court finds no dispute of material fact. *See* Fed. R. Civ. P. 56(a), (g).

8       Defendants move for summary judgment on the grounds that the enforcement positions

9  identified by Miyoko's do not satisfy the threshold inquiry under *Central Hudson Gas & Electric*

10  *Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), because they restrain

11  false or misleading commercial speech, or in the alternative, that the enforcement positions are

12  restraints on commercial speech that satisfy the intermediate scrutiny test explained in *Central*

13  *Hudson*. As to the "enforcement position" concerning an image in Miyoko's website, Defendants

14  seek summary judgment on the grounds that the issue is moot and the Court therefore lacks

15  jurisdiction under Article III of the United States Constitution. *See Bd. of Trustees of Glazing*

16  *Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

17       Defendants' motion is based on the following Memorandum, pleadings, and evidence that

18  the Court may consider. Defendants' supporting evidence is already in the case file; Defendants

19  prepared an appendix of cited evidence, filed concurrently with this Motion, to assist the Court.

20

21  Dated:  December 9, 2020          Respectfully Submitted,

22                                        XAVIER BECERRA

23                                        Attorney General of California
                                      MYUNG J. PARK

24                                        Supervising Deputy Attorney General

25                                          */s/ Michael S. Dorsi*
                                      MICHAEL S. DORSI

26                                        Deputy Attorney General
                                      *Attorneys for Defendants*

27  _____

28       [2] This motion is noticed motion under Northern District of California Local Rule 7-2, with
hearing automatically vacated pursuant to Northern District of California General Order 72.

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................... 1

Issues to Be Decided ....................................................................................................... 2

Background and Evidence ............................................................................................... 2

     I.      Federal Rules Limit State Discretion in Food Labeling Regulation ..................... 2

     II.     The Department's December 9 Letter Accords With Federal Law ....................... 3

Legal Argument ............................................................................................................... 5

     I.      Legal Standards ................................................................................................... 5

     II.     Miyoko's Statements of "Hormone Free" and "Revolutionizing Dairy With Plants" Are Not Entitled to First Amendment Protection Because They Do Not Satisfy the Threshold Inquiry Under *Central Hudson* .................................... 6

          A.     Miyoko's Claim That Its Product Is "Hormone Free" Is Not Entitled to First Amendment Protection Because It Is False ..................... 6

          B.     The Phrase "Revolutionizing Dairy With Plants" Is Not Entitled to First Amendment Protection Because Miyoko's Use Is Plainly Misleading ............................................................................................. 7

     III.    The Constitution Permits the Department to Require Accurate Use of the Term "Butter" ...................................................................................................... 8

          A.     Miyoko's Use of the Term "Butter" Is Misleading and Thus Not Entitled to First Amendment Protection ................................................ 8

          B.     The Department's Enforcement of Standards of Identity Satisfies Intermediate Scrutiny by Directly Advancing a Comprehensive Consumer Information Scheme .......................................................... 10

     IV.    The Department Is Correct to Require Miyoko's to Remove Statements Associated With Dairy Products From Its Package ........................................... 13

     V.     Miyoko's Claim Concerning the Image on Its Website Is Moot ....................... 14

Conclusion .................................................................................................................... 16

1

## TABLE OF AUTHORITIES

2

**Page**

3  **CASES**

4  *Alliance for Wild Rockies v. Cottrell*
5    632 F.3d 1127 (9th Cir. 2011) ...................................................................... 5

6  *Am. Civil Liberties Union of Nevada v. City of Las Vegas*
     333 F.3d 1092 (9th Cir. 2003) ...................................................................... 5
7
   *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*
8    941 F.3d 1195 (9th Cir. 2019) .............................................................. 14, 15

9  *Celotex Corp. v. Catrett*
10   477 U.S. 317 (1986) ...................................................................................... 5

11 *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
     447 U.S. 557 (1980) ............................................................... 6, 7, 8, 10–11
12
   *City of Erie v. Pap's A.M.*
13   529 U.S. 277 (2000) .................................................................................... 14

14 *Commercial Mfg. Co. v. Fairbank Canning Co.*
15   135 U.S. 176 (1890) ...................................................................................... 8

16 *Duran v. Hampton Creek*
     No. 3:15-cv-05497-LB, 2016 WL 1191685 (N.D. Cal. Mar. 28, 2016) ................ 11, 13
17
   *Earth Island Inst. v. Carlton*
18   626 F.3d 462 (9th Cir. 2010) ...................................................................... 6

19 *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*
     628 F.2d 500 (5th Cir. 1980) .................................................................... 10
20
   *Fed. Sec. Adm'r v. Quaker Oats Co.*
21   318 U.S. 218 (1943) .................................................................................... 11

22 *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*
23   741 F. Supp. 2d 1165 (C.D. Cal. 2010) .................................................... 10

24 *Fikre v. Fed. Bureau of Investigation*
     904 F.3d 1033 ............................................................................................ 15
25
   *Gordon v. Drape Creative, Inc.*
26   909 F.3d 257 (9th Cir. 2018) .................................................................... 10

27 *Int'l Dairy Foods Ass'n v. Boggs*
28   No. 2:08-CV-628, 2009 WL 937045 (S.D. Ohio Apr. 2, 2009) ...................... 7

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3      *Maldonado v. Morales*
4          556 F.3d 1037 (9th Cir. 2009) ............................................................. 12

5      *Matal v. Tam*
           137 S. Ct. 1744 (2017) ...................................................................... 10

6      *McCormack v. Herzog*
7          788 F.3d 1017 (9th Cir. 2015) ............................................................. 15

8      *Metro Lights, L.L.C. v. City of Los Angeles*
           551 F.3d 898 (9th Cir. 2009) ............................................................. 6, 8
9

10     *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
           434 U.S. 1345 (1977) ......................................................................... 6

11
       *Pub. Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*
12         632 F.3d 212 (5th Cir. 2011) ............................................................. 11

13     *Show Media California, LLC v. City of Los Angeles*
           479 F. App'x 48 (9th Cir. 2012) ......................................................... 12
14

15     *United States v. Concentrated Phosphate Export Ass'n*
           393 U.S. 199 (1968). Action ............................................................. 14

16
       *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*
17         425 U.S. 748 (1976) ......................................................................... 11

18     *White v. Lee*
           227 F.3d 1214 (9th Cir. 2000) .......................................................14, 15
19

20     *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*
           471 U.S. 626 (1985) ........................................................................... 6

21     **STATUTES**

22
       21 United States Code
23         § 321a ...............................................................................1, 3, 4, 13
           § 343 ...................................................................................1, 2, 13
24
       California Food & Agricultural Code
25         § 32912.5 ............................................................................... 2
           § 32913 .................................................................................. 3
26         § 38955 ...............................................................1, 4, 14–15
           § 38956 ................................................................................. 15
27         § 39501 .................................................................................. 3
           § 39521 ................................................................................. 3, 4
28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

First Amendment ................................................................................................ *passim*

**COURT RULES**

Federal Rules of Civil Procedure
    54(b) ............................................................................................................... 5
    56(c) ............................................................................................................... 5
    56(e) ............................................................................................................... 5

**REGULATIONS**

Code of Federal Regulations, Title 21
    § 101.18 ..................................................................................................... 5, 13
    § 102.5 ....................................................................................................... 5, 13
    § 130.8 ..................................................................................................... 2, 5, 13
    § 150.110 ......................................................................................................... 12
    § 164.110 ......................................................................................................... 12
    § 166.110 ........................................................................................................... 3

42 Federal Register
    14,445 .............................................................................................................. 12
    14,475 .............................................................................................................. 12

**OTHER AUTHORITIES**

6 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed. 2020) ............................ 10

Earth Balance ................................................................................................... 3, 8, 9

Jeannine Bentley & Mark Ash, *Butter and Margarine Availability Over the Last Century*, U.S. Dep't of Agric. Econ. Research Serv. (July 5, 2016) .................................. 8, 9

*Revolution*, Black's Law Dictionary (11th ed. 2019) .................................................... 7

*Revolutionize*, Merriam-Webster.com Dictionary (2020) ................................................ 7

REVOLUTIONIZING DAIRY WITH PLANTS, U.S. Patent & Trademark Office Registration No. 5747653 (May 7, 2019) ............................................................. 7

**INTRODUCTION**

The California Department of Food and Agriculture (the "Department") applies uniform rules requiring food producers to clearly identify their products. These rules apply *standards of identity*—definitions from federal and state statutes and regulations that require specific contents in foods. Products that meet those standards must be called by that name, and products that do not meet the standard must not. 21 U.S.C. § 343(b). These decades-old standards define butter as made from milk or cream and containing at least 80% fat. 21 U.S.C. § 321a.

Plaintiff Miyoko's Kitchen, Inc. ("Miyoko's") makes a product it calls "Vegan Butter," which contains no dairy and is less than 80% fat. The California Department of Food and Agriculture notified Miyoko's that (1) its product could not be called butter, (2) the product could not incorrectly state that it is hormone free, and (3) the product could not use other phrasing that may cause confusion with dairy products. The Department withdrew its fourth position, concerning an image of a woman hugging a cow on Miyoko's website. *See* ECF No. 37 (citing Cal. Food & Agric. Code § 38955). Miyoko's claims that it has a First Amendment right to label and market its product as "butter" and use the other designations, and that it is entitled to a determination of its rights concerning the image on the website.

On Miyoko's Motion for Preliminary Injunction, this Court issued a split decision, granting the Motion as to restrictions on the terms "Butter," "Lactose Free," and "Cruelty Free," and denying the Motion as to restrictions on the terms "Hormone Free" and "Revolutionizing Dairy With Plants." That order relied almost entirely on undisputed facts.

Recognizing that material facts are not in dispute, the Department now moves for summary judgment. The Department contends that summary judgment should be granted in its favor if the Court correctly applies the facts to the law. Specifically, the combination of the long-standing federal statute defining butter, the history of the use of the term "butter," and empirical survey results suffice to grant summary judgment for the Department either at the threshold stage (the statements are inherently misleading) or to justify the regulation under intermediate scrutiny.

Further, the Court has not yet addressed whether the claim concerning Miyoko's website is moot, determining only that a preliminary injunction was unnecessary. That issue is now before

1

1    the Court.  The Department admitted that this statement was in error because the relevant statute

2    requires a regulation—which has not been promulgated—and applies only to the package itself.

3    This view is a correct analysis of the governing statute.  As a result, the website issue is moot, and

4    the Court lacks jurisdiction to hear it.

5                                     **ISSUES TO BE DECIDED**

6            1.      Based on the undisputed facts in this case, which, if any, of the consumer

7    protection restrictions stated in the December 9 letter from the California Department of Food and

8    Agriculture to Miyoko's Kitchen, Inc., violate the First Amendment?

9            2.      Given the Department's concession that California Food and Agricultural Code

10   Section 38955 does not authorize it to regulate the images on Miyoko's website, is Miyoko's

11   claim concerning the restriction of its website moot?

12                                **BACKGROUND AND EVIDENCE**

13   **I.      FEDERAL RULES LIMIT STATE DISCRETION IN FOOD LABELING REGULATION**

14           Although laws regulating food marketing fall within states' traditional police powers, the

15   content of limits on food marketing are, for the most part, set by the federal government.  The

16   Food, Drug, and Cosmetic Act ("FDCA") establishes a comprehensive scheme for food labeling.

17   The FDCA, as amended by the Nutrition Labeling and Education Act, preempts most state food

18   labeling regulation that is not identical to federal rules.  With few exceptions, states have only

19   two options concerning labeling requirements: enforce the federal food labeling rules or enforce

20   no food labeling rules at all.

21           The California Legislature elected to enforce the federal rules, directing the Secretary of the

22   Department of Food and Agriculture to review and approve labels consistent with the Food, Drug,

23   and Cosmetic Act and Title 21 of the Code of Federal Regulations for "milk, frozen and cultured

24   dairy products, cheese, and products resembling milk products . . . ."  *See* Cal. Food & Agric.

25   Code § 32912.5.  Federal law prohibits misbranding, including the sale of one food "under the

26   name of another food."  21 U.S.C. § 343(b).  The same federal statute prohibits identifying a food

27   by a name that has a federal standard of identity if it does not conform to that standard.  *See* 21

28   U.S.C. § 343(g); *see also* 21 C.F.R. § 130.8 (compliance with standards of identity).

2

1    The standard of identity for butter is clear and well-established.  The federal statute for

2    butter dates to 1923 and requires the product to be made from milk or cream and contain at least

3    80% fat.  21 U.S.C. § 321a.  This standard of identity does not prohibit competition from plant-

4    based alternatives; they simply allowed sales under other names: margarines and spreads.  *See,*

5    *e.g.*, Cal. Food & Agric. Code § 32913.

6    As with butter, the federal government established a standard of identity for margarine,

7    which also included an 80% minimum fat requirement.  *See* 21 C.F.R. § 166.110.  Butter

8    alternatives not conforming to the standards of identity for butter or margarine are defined as

9    "dairy spreads" if they contain dairy or "spreads" if they do not.  *See* Cal. Food & Agric. Code §§

10   39501 (dairy spreads), 39521 (spreads).  These include spreads marketed as vegan alternatives to

11   butter that have been on the market since the late 1990's.  *See, e.g.*, Earth Balance,

12   https://perma.cc/8MZ2-7S5B (describing first vegan spread product sold in 1998).

13   Like vegan spreads, dairy spreads cannot market themselves as butter.  The Department's

14   position is that federal and California law prohibit producers from identifying these products as

15   "butter."  *See* Second Declaration of Stephen Beam ("Beam Decl.") (ECF No. 38-1), ¶¶7, 10.

16   The concept of Miyoko's product—a plant-based alternative to butter—is not new.  What is new

17   about Miyoko's is its insistence on calling it "butter."  Miyoko's is the first producer of which the

18   Department is aware to seek approval for a label calling its 100% plant-based product "butter."

19   *See id.* at ¶11.  The Department responded in accord with federal and state law: it told Miyoko's

20   that this is not allowed.  *See* ECF No. 1-1 (December 9 letter).

21   **II.    THE DEPARTMENT'S DECEMBER 9 LETTER ACCORDS WITH FEDERAL LAW**

22   The package for Miyoko's "vegan butter" identifies itself three ways:

23   •   Cashew & Coconut Oil Spread (fine print,

24        lower left corner),

25   •   Cashew Cream Fermented With Live Cultures

26        (bottom of yellow stripe), and

27   •   European Style Cultured Vegan Butter (largest

28        font, right side of package)



3

1    Miyoko's label was unlike previous labels submitted for review.  The Department

2  concluded that Miyoko's product does not satisfy the standard of identity because it is not a dairy

3  product.  In addition, it does not contain at least 80% fat.[3]

4    The Department's letter dated December 9, 2019, identified five violations of state and

5  federal law.  The principal violation, listed second,[4] is that Miyoko's calls its product "butter,"

6  which it is not.  *See* ECF No. 1-1 ("The product cannot bear the name "Butter" because the

7  product is not butter.  'Butter' is a defined term in 21 U.S.C. 321a as a food product made

8  exclusively from milk or cream . . . .").

9    Next, the Department informed Miyoko's that it must remove the image of a person

10  hugging a cow from its website pursuant to California Food and Agricultural Code Section

11  38955.  The Department has since admitted that this statement was in error because Section

12  38955 requires a regulation (which has not been promulgated) and applies only to the package

13  itself.  *See* ECF No. 37 (citing Cal. Food & Agric. Code § 38955).

14    The Department then addressed the phrase "Hormone Free" on the side of the box:

15
16
17
18
19



20  The Department stated that "Although the food may be of plant origin, plants also contain

21  endogenous hormones which regulate growth."  ECF No. 1-1 at 2.  Miyoko's concedes that the

22  statement "Hormone Free" is not true and the Department's statement concerning plant hormones

23  _____

[3] Although the precise percentage cannot be determined from the package because federal
24  regulations call for rounding to the nearest gram, the Department consulted with Miyoko's and
confirmed that the fat content being under 80% is not in dispute.  As a result, under California
25  law, Miyoko's product is a "spread."  *See* Cal. Food & Agric. Code § 39521 ("butter alternatives
that contain less than 80% fat are defined as spreads").

26  [4] The first listed violation is Miyoko's use of two statements of identity: "Cultured Vegan
Butter" and "Cashew Cream fermented with live cultures."  Miyoko's Complaint does not
27  challenge this violation.  This is an ordinary consumer protection restriction.  However, the
Department's position that Miyoko's may not call its product "Cultured Vegan Butter" bears on
which statement of identity Miyoko's may use.  Accordingly, this issue cannot be resolved
28  without resolving whether Miyoko's may title its product "vegan butter."

4

1   is correct.  But Miyoko's contends that it does not matter because it means to refer to synthetic

2   hormones injected into cows.  *See* Complaint, ¶23.

3        The remaining claims in the December 9 letter concerned the phrases "Lactose Free,"

4   "Cruelty Free," and "Revolutionizing Dairy with Plants."  These phrases are of the type that a

5   customer may expect to find on specialized dairy products, such as lactose-free milk, milk from

6   free-range cows, or other human health and animal welfare-focused producers.  The Department

7   noted that these claims "imply that the product may be a dairy food without these characteristics."

8   *See* ECF No. 1-1 at 2 (discussing 21 C.F.R. §§ 101.18, 102.5(a), and 130.8).

9                                      **LEGAL ARGUMENT**

10  **I.    LEGAL STANDARDS**

11       A court should grant summary judgment "if the pleadings, depositions, answers to

12  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

13  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

14  matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate

15  the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

16  (1986).  If the movant succeeds, the burden then shifts to the nonmoving party to identify

17  reasonable disputes of material fact.  *See* Fed. R. Civ. P. 56(e).  On a motion for summary

18  judgment, the court views evidence in the light most favorable to the nonmoving party.  *See Am.*

19  *Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

20       This Court's ruling on Miyoko's Motion for Preliminary Injunction (ECF No. 46) does not

21  constrain its ruling on this Motion.  The standard for a preliminary injunction weighs evidence,

22  which a motion for summary judgment does not.  *Compare Alliance for Wild Rockies v. Cottrell*,

23  632 F.3d 1127, 1134 (9th Cir. 2011) *with Celotex*, 477 U.S. at 323.  Moreover, even on a subject

24  where the Court considered undisputed evidence, a court's conclusion "may be revised at any

25  time before the entry of a judgment adjudicating all the claims and all the parties' rights and

26  liabilities."  Fed. R. Civ. P. 54(b).

27       Miyoko's seeks injunctive relief concerning multiple different statements: the use of the

28  term "vegan butter," the claim that its product is "hormone free," statements ordinarily associated

                                           5

1    with specialized dairy products, and an image on its website.  On the Motion for Preliminary

2    Injunction, this Court evaluated the constitutionality of each proposed restriction, rather than

3    adopting an *all or nothing* approach.  ECF No. 46 at 7–14; *see also Earth Island Inst. v. Carlton*,

4    626 F.3d 462, 475 (9th Cir. 2010) ("[D]istrict courts have broad latitude in fashioning equitable

5    relief when necessary . . . ." (internal quotation omitted)).  This is the correct approach; the Court

6    should not permit an unconstitutional restriction because it was part of the same letter as other

7    permissible regulations, nor should it restrain the Department from any constitutionally

8    permissible restriction because it was stated in the same letter as an impermissible restraint.  *Cf.*

9    *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)

10   (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes

11   enacted by representatives of its people, it suffers a form of irreparable injury.").

12   **II.    MIYOKO'S STATEMENTS OF "HORMONE FREE" AND "REVOLUTIONIZING DAIRY
        WITH PLANTS" ARE NOT ENTITLED TO FIRST AMENDMENT PROTECTION BECAUSE
13      THEY DO NOT SATISFY THE THRESHOLD INQUIRY UNDER *CENTRAL HUDSON***

14          "The States and the Federal Government are free to prevent the dissemination of

15   commercial speech that is false, deceptive, or misleading . . . ." *Zauderer v. Office of*

16   *Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985).  The form of

17   intermediate scrutiny of commercial speech set out in *Central Hudson*, applies only "if 'the

18   communication is neither misleading nor related to unlawful activity,'" *Metro Lights, L.L.C. v.*

19   *City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (quoting *Cent. Hudson Gas & Elec. Corp.*

20   *v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564–66 (1980)).  This inquiry is "a threshold

21   matter." *Id.*  In its order on the Motion for Preliminary Injunction, this Court denied relief for

22   Miyoko's concerning restrictions on two statements on its package: "Hormone Free" and

23   "Revolutionizing Dairy With Plants."  Both of these determinations relied only on undisputed

24   facts, and the Court should reach the same conclusion on summary judgment.

25          **A.    Miyoko's Claim That Its Product Is "Hormone Free" Is Not Entitled to
                First Amendment Protection Because It Is False**
26

27          In the Preliminary Injunction Order, this Court explained that "[b]ecause its plant-based

28   butter is not 'hormone free,' there is no merit to Miyoko's request for license to label it with that

6

1  term."  ECF No. 46 at 6:24–25.  This conclusion was based on undisputed facts.  *Id.* at 5:16–17

2  ("The parties do not seriously disagree about the truthfulness of Miyoko's 'hormone free'

3  claim").  The Department correctly stated that Miyoko's may not label its product as "hormone

4  free" because "although the food may be of plant origin, plants also contain endogenous

5  hormones which regulate growth."  ECF No. 1-1 at 2.

6       In this Court's order on the Motion for Preliminary Injunction, this Court joined the

7  apparently unanimous view of courts and agencies considering this issue that a regulator has

8  "authority to demand that products claiming to lack hormones actually lack hormones."  ECF No.

9  46 at 6:15–16 (citing *Int'l Dairy Foods Ass'n v. Boggs*, No. 2:08-CV-628, 2009 WL 937045, at

10  \*8 (S.D. Ohio Apr. 2, 2009), *aff'd in part, rev'd in part on other grounds*, 622 F.3d 628 (6th Cir.

11  2010).  Miyoko's Complaint asserts that "consumers understand" that Miyoko's is "merely

12  emphasizing that it does not contain the controversial animal hormones artificially injected into

13  some milk-producing cows."  Complaint, ¶23.  But the threshold inquiry of *Central Hudson* does

14  not contain an exception when the producer claims that some customers already understand that

15  the statement is untrue.  Because there is no dispute of fact on this issue, the outcome should be

16  the same.  The Court should grant summary judgment for the Department on the restriction of the

17  term "Hormone Free."

18       **B.    The Phrase "Revolutionizing Dairy With Plants" Is Not Entitled to First
             Amendment Protection Because Miyoko's Use Is Plainly Misleading**

19

20       Like "Hormone Free," the statement "Revolutionizing Dairy With Plants" does not satisfy

21  the threshold inquiry under *Central Hudson*.  On Miyoko's package, the largest text is the phrase

22  "Revolutionizing Dairy with Plants."[5]  To *revolutionize* is to *change fundamentally or completely*.

23  *Revolutionize*, Merriam-Webster.com Dictionary (2020) ("3. to change fundamentally or

24  completely"), *Revolution*, Black's Law Dictionary (11th ed. 2019) ("2. A complete change in

25  ways of thinking or methods of doing things.").  In its order on the Motion for Preliminary

26  Injunction, this Court correctly concluded that "this is not at the core of what Miyoko's—a maker

27

28       [5] Miyoko's also registered this phrase as a trademark.  REVOLUTIONIZING DAIRY
    WITH PLANTS, U.S. Patent & Trademark Office, Registration No. 5747653 (May 7, 2019).

1    of dairy *replacements*—does or seeks to do. Just like the statement that a vegan clothier's

2    motorcycle jackets 'revolutionize leather with cotton,' or that a maker of non-alcoholic beverages

3    'revolutionizes whiskey with seltzer,' this claim of Miyoko's is plainly misleading." ECF No. 46

4    at 12:22–13:2. Context provides no help for Miyoko's. They sell a product in a market where

5    non-dairy substitutes have been sold for decades. *See, e.g.*, Jeannine Bentley & Mark Ash, *Butter*

6    *and Margarine Availability Over the Last Century*, U.S. Dep't of Agric. Econ. Research Serv.

7    (July 5, 2016), https://perma.cc/BTN7-G9AQ, Earth Balance, https://perma.cc/8MZ2-7S5B

8    (describing first vegan spread product sold in 1998).

9         As with the term "Hormone Free," the Court's conclusion on the Motion for Preliminary

10   Injunction did not turn on disputed facts. Like that claim, the Court should grant summary

11   judgment in favor of the Department consistent with its preliminary injunction order.

12   **III.   THE CONSTITUTION PERMITS THE DEPARTMENT TO REQUIRE ACCURATE USE OF
13          THE TERM "BUTTER"**

            **A.   Miyoko's Use of the Term "Butter" Is Misleading and Thus Not Entitled to
14              First Amendment Protection**

15        The threshold inquiry under *Central Hudson* requires a finding that the statements at issue

16   are not misleading. *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir.

17   2009) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S.

18   557, 564–66 (1980)). The evidence already in the record in this case—that the package

19   containing the identifier "Butter" and the statements "Cruelty Free" and Lactose Free" presents a

20   substantial risk of confusion—suffices for the Court to grant summary judgment for the

21   Department at both the threshold inquiry and the intermediate scrutiny under *Central Hudson*.

22   Given precedent affirming trademark protection at even lower rates, a confusion rate at roughly 1

23   in 4 customers is more than enough to justify the Department's regulation.

24        In denying the Motion for Preliminary Injunction, the Court concluded that the federal and

25   state statutes were not sufficiently anchored by "precedent, empirical research, or any other form

26   of independently authoritative ballast . . . ." ECF No. 46 at 10:19–20. But the history of usage is

27   well-established. Courts acknowledged alternatives to butter as early as the 1890s. *See, e.g.*,

28   *Commercial Mfg. Co. v. Fairbank Canning Co.*, 135 U.S. 176, 177 (1890) (adjudicating claims

                                                 8

1   concerning margarine).  Butter was seen as an alternative to margarine—a product that out-sold

2   butter for decades.  *See* Jeannine Bentley & Mark Ash, *Butter and Margarine Availability Over*

3   *the Last Century*, U.S. Dep't of Agric. Econ. Research Serv. (July 5, 2016),

4   https://perma.cc/BTN7-G9AQ.  And products advertising their plant-based ingredients and the

5   environmental benefits of their production have been on the market since the 1990s.  *See, e.g.*,

6   Earth Balance, https://perma.cc/8MZ2-7S5B (describing first vegan spread sold in 1998).  Given

7   that history, it is misleading to call the product "Butter." Miyoko's "Vegan Butter" is an outlier.

8          Miyoko's own evidence offered in support of the Motion for Preliminary Injunction shows

9   that many customers are confused by similar existing products.  In the Feltz study,[6] attached to

10   the Sawhney Declaration as Exhibit F (ECF No. 24-6, pp. 49–96), 26% of subjects failed to

11   recognize that vegan cream cheese was plant-based.  *See* ECF No. 24-6, pp. 50, 72 (showing 74%

12   correct responses).[7]  Like Miyoko's product, the test product, Daiya Plain Cream Cheese Spread

13   used the name of a dairy product and displayed dairy-associated statements, including "lactose

14   free."  *Id.* at 77; *see* Part IV, *infra*.

15

16 

17

18 

19

20

21          This result was not in the middle of surveyed products; survey recipients misidentified the

22   vegan cream cheese product more often than they misidentified any dairy product.  Although this

23   is not a direct test of Miyoko's product, it demonstrates the misleading nature of advertising

24   plant-based products by the names of dairy products.  *See id.*  Miyoko's package creates risks of

25   confusion similar to a package that caused more than 1 in 4 test subjects to misidentify it.

26   _____

27   [6] After review, the Department concedes that the study offered as evidence by Miyoko's is
     the most thorough analysis of similar products, and therefore the most useful for this case.

28   [7] The Feltz study did not test a vegan butter; vegan cream cheese is the closest analog in
     the surveys.

9

During the preliminary injunction hearing, the Court expressed concern about the requisite percentage of confused customers to justify a regulation. Although there appears to be no case on point concerning a direct challenge to government regulation under *Central Hudson*, cases addressing the Lanham Act—the framework of federal trademark law—are instructive.[8] It is well-established that except in challenges to unusual provisions, *see, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017), the Lanham Act is constitutional. In ordinary product identification cases (*e.g.*, not works of art), the Lanham Act's requirement to prove likely confusion comfortably accords with the First Amendment. *See, e.g.*, *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018). And trademark cases routinely inquire into what percentage of customers confused is sufficient to justify an injunction. *See, e.g.*, *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% confusion), *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1179 (C.D. Cal. 2010) (24.3% confusion); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (5th ed. 2020) (cataloging rates of confusion found sufficient). The Fifth Circuit's decision in *Exxon* is instructive. There, Exxon showed survey results where 15% of customers associated the defendant's "Texon" sign with Exxon. *Exxon*, 628 F.3d at 507. Exxon ran service stations selling gasoline and car care services. Texon no longer sold gas but sold car care. The Court of Appeals reversed the trial court, directing it to enter an injunction to protect Exxon based on the evidence of confusion (at a 15% rate) combined with evidence of similar products and markets. *Id.* at 504, 507–08. Miyoko's product is similar. It is a substitute for butter. Many stores place it in the dairy aisle. But it contains no dairy content. This result combined with historical usage reinforced by long-established statutes demonstrate that Miyoko's package is inherently confusing.

**B.    The Department's Enforcement of Standards of Identity Satisfies Intermediate Scrutiny by Directly Advancing a Comprehensive Consumer Information Scheme**

But even if Miyoko's claim survives the threshold inquiry, the Department satisfies the remaining factors under *Central Hudson*. Under *Central Hudson*, the state must assert a

---

[8] On the motion for preliminary injunction, the question of the required level of customer confusion was not addressed in the briefs. Although counsel discussed the analogy to trademark law at argument on the preliminary injunction, it merits more in-depth consideration here.

1    substantial interest, the restriction must directly advance the interest, and the restriction must not

2    be "more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 564–66.

3          There is no serious dispute whether the government has a substantial interest in regulation

4    of advertising and marketing to avoid customer confusion. *See Duran v. Hampton Creek*, No.

5    3:15-cv-05497-LB, 2016 WL 1191685, at *1, *6 (N.D. Cal. Mar. 28, 2016); *see also Pub. Citizen*

6    *Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 225 (5th Cir. 2011) (acknowledging

7    "substantial interest in preventing consumer confusion"). The Supreme Court has repeatedly

8    reaffirmed that "[t]he First Amendment . . . does not prohibit the State from insuring that the

9    stream of commercial information flow[s] cleanly as well as freely." *Virginia State Bd. of*

10   *Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 (1976).

11         Following standards of identity also satisfies the final two factors, directly advancing the

12   government interest and tailoring the regulation to serve that interest. Standards of identity are a

13   time-tested approach to prevent misleading or confusing speech. Government enforcement of

14   standards of identity create a comprehensive scheme that protects consumers from confusion and

15   "economic adulteration"—where producers used different proportions of components in their

16   products, rendering them "inferior to that which the consumer expected to receive when

17   purchasing a product with the name under which it was sold." *Fed. Sec. Adm'r v. Quaker Oats*

18   *Co.*, 318 U.S. 218, 230 (1943) (citing legislative history). "The provisions for standards of

19   identity thus reflect a recognition by Congress of the inability of consumers in some cases to

20   determine, solely on the basis of informative labeling, the relative merits of a variety of products

21   superficially resembling each other." *Id.* at 230–31.

22         Miyoko's product fails to conform to standards of identity because is not made from milk

23   or cream and it contains under 80% fat. When products in the marketplace fail to comply with

24   these rules, customers intending to purchase butter are more likely to leave the store with

25   something else. This is not only a concern that customers may purchase Miyoko's product when

26   intending to purchase butter. When a product deviates from standards of identity, it not only risks

27   confusion with that product. It also blurs the line between products in the marketplace more

28   broadly, rendering the federal definition meaningless and undermining the consistent scheme.

The Department's policy is to avoid this risk and create a level playing field where all products identified as butter satisfy both requirements.  *See* Beam Decl., ¶¶7–10.  Miyoko's vegan butter does not satisfy the rule and permitting it to do so would allow one company to operate outside the framework applied to all of Miyoko's competitors.

When deciding how to narrowly tailor a regulation of commercial speech, the government is well within its rights to consider the cost of different policy choices.  *See, e.g.*, *Show Media California, LLC v. City of Los Angeles*, 479 F. App'x 48, 50 (9th Cir. 2012) (allowing grandfathering of existing use so that city could avoid paying compensation for takings); *Maldonado v. Morales*, 556 F.3d 1037, 1048 (9th Cir. 2009) (reaching same conclusion in intermediate scrutiny analysis for equal protection challenge).  Here, the Department receives thousands of labels submitted for approval each year.  Roughly 10% of those require a response asking for revision.  Beam Decl., ¶6.  Given the volume of applications and the interest in fair competition, the Department's approach is the best way to apply a consistent rule to all products: margarine and spreads (containing dairy or plant-based) cannot be identified as butter, and butter cannot be identified as margarine.

In its Complaint and Motion for Preliminary Injunction, Miyoko's points to products like peanut butter and fruit butter, claiming that its product is analogous.  *See* Complaint (ECF No. 1), ¶29, Motion for Preliminary Injunction (ECF No. 24-1), p. 16:8–9.  But the Department's position toward nut and fruit butters follows from long-standing federal standards of identity for those products—standards that differ from butter.  *See* Beam Decl., ¶16 (discussing Peanut Butter, 21 CFR §§ 164.110 (first promulgated by Tree and Peanut Products, 42 Fed. Reg. 14,475 (March 15, 1977)), Fruit Butter, 21 C.F.R. § 150.110 (first promulgated by Fruit Butter, 42 Fed. Reg. 14,445 (March 15, 1977)).  Both peanut butter and fruit butter taste nothing like dairy butter.  They are used differently than dairy butter.  And they have a long history of common usage.  The federal standards of identity for nut and fruit butters reflect the recognition that, because of use, history, and recognition, fruit and nut butter labels will not be misleading to consumers looking for dairy butter.  Miyoko's butter without dairy is more analogous to a mayonnaise without egg that substitutes for conventional mayonnaise (which contains egg).  When evaluating an eggless

12

1    mayonnaise alternative called "Just Mayo," this Court concluded that customers may plausibly be

2    confused.  *Duran v. Hampton Creek.  See* 2016 WL 1191685 at *1, *6 (denying motion to

3    dismiss; case settled before summary judgment motions).  There, as here, the vegan product is a

4    direct substitute for the non-vegan product.

5         There is no daylight between the Department's position on butter and the federal standard

6    of identity codified in 1923.  California requires that products satisfy the federal standard of

7    identity for butter.  Federal law requires the product to be made from milk or cream and contain at

8    least 80% fat, 21 U.S.C. § 321a, and prohibits the sale of one food "under the name of another

9    food," 21 U.S.C. § 343(b).  There is no dispute that Miyoko's "Vegan Butter" does not satisfy

10   these requirements.  While Miyoko's Complaint formally challenges the Department's

11   "enforcement position," approving Miyoko's label would be inconsistent with federal law.  The

12   ultimate question is whether these statutes, as applied to Miyoko's "Vegan Butter" product,

13   violate the First Amendment.  And the evidence demonstrates that the First Amendment does not

14   compel the abolition of standards of identity for foods.

15   **IV.    THE DEPARTMENT IS CORRECT TO REQUIRE MIYOKO'S TO REMOVE STATEMENTS
             ASSOCIATED WITH DAIRY PRODUCTS FROM ITS PACKAGE**
16

17        The Department separately cautioned by Miyoko's that its package presents terms that raise

18   the risk that its product will be confused for a dairy product: labeling the product "Lactose Free"

19   and "Cruelty Free."  These restrictions, though discussed above to show that Miyoko's product is

20   analogous to the Daiya "Cream Cheese" product tested in the Feltz Study, are also independently

21   justified under *Central Hudson*.  In doing so, the Department followed federal regulations—

22   regulations that the Department has no discretion to modify.  *See* ECF No. 1-1 (citing 21 C.F.R.

23   §§ 101.18, 102.5, and 130.8).  Miyoko's claims that its consumers understand that it is not a dairy

24   product, *see* Complaint, ¶¶23, 33, and that the terms "Lactose Free" and "Cruelty Free" are

25   necessarily true statements about their plant-based product.  In other words, the statements are

26   superfluous marketing.  But on a dairy product these terms would signify that it is a specialty

27   product.  The term "hormone free," in addition to being impermissible because it is untrue,

28   contributes to potential confusion when used in concert with these other terms.  As discussed

13

1    concerning the term "Butter," the risk of consumer confusion suffices to grant summary judgment

2    for the Department at both the threshold stage and the intermediate scrutiny inquiry.

3    **V.    MIYOKO'S CLAIM CONCERNING THE IMAGE ON ITS WEBSITE IS MOOT**

4            When an issue raised is no longer live, the claim is moot and the court lacks jurisdiction to

5    resolve the claim.  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  Although voluntary

6    cessation by a government entity does not automatically eliminate jurisdiction, a claim is moot

7    when the party whose conduct is challenged demonstrates that it cannot reasonably be expected to

8    recur.  *See United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).

9    Action by a state legislature, such as repealing a challenged statute or allowing it to expire, is not

10   treated as voluntary cessation and is sufficient to render a challenge moot.  *Bd. of Trustees of*

11   *Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)

12   (dismissing as moot challenge to law repealed by Nevada Legislature after challenge in district

13   court).  Similarly, a permanent change to policy may also render a challenge moot.  *See White v.*

14   *Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (dismissing claim for mootness after unequivocal policy

15   change in memorandum from Assistant Secretary).

16           Here, Miyoko's challenges what it characterizes as an "enforcement position" by the

17   Department.  In the December 9 Letter, the Department instructed Miyoko's to remove the image

18   of a person hugging a cow from its website.  In that Letter, the Department cited California Food

19   and Agricultural Code, section 38955—which prohibits depictions of dairy-associated terms and

20   images on the packages of imitation milk products—as authority for this demand.  After

21   Miyoko's initiated this litigation, the Department reviewed its position.  After completing its

22   review, the Department attested that its position was not consistent with the statute because

23   Section 38955 applies only to the package itself and requires the promulgation of a regulation

24   (which has not been promulgated).[9]  *See* ECF No. 37 at 2 (citing Cal. Food & Agric. Code

25           [9] In declining to rule on this issue on Miyoko's Motion for Preliminary Injunction, the
26   Court commented that it was "[p]roceeding on the understanding that the Department's
     conclusion as to its lack of authority under 'the relevant statute' was not just artful wording—but
27   rather, a good faith concession that it was genuinely unaware of *any* statute conferring such
     authority . . . ."  In the interest of thoroughness and transparency, the Department and the
28   Attorney General's Office reviewed the relevant statutes to confirm this position.  The

                                                    14

1    § 38955).  This notice is signed by the Branch Chief of the Milk and Dairy Food Safety Branch

2    and a Deputy Attorney General from the California Attorney General's Office.

3         While it appears that no court has addressed mootness when an agency concedes that its

4    position was contrary to a statute, that concession suffices to demonstrate that the assertion of its

5    position cannot reasonably be expected to recur.  The unanimous en banc Ninth Circuit explained

6    in *Glazing Health*, 941 F.3d at 1199, that the force of statutory law suffices to demonstrate

7    mootness, shifting the burden to the party challenging the presumption of mootness.  And the

8    Department's acknowledgment of the statute represents a clear statement of policy, not only for

9    this case, but for the general application of Section 38955.  *Cf. White*, 227 F.3d at 1243.

10        At the preliminary injunction stage, Miyoko's contended that the Department's notice does

11   not indicate "that the change in its behavior is 'entrenched' or 'permanent.'"  ECF No. 43 at 3:25–

12   27 (quoting *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1037 and (9th Cir. 2018)

13   *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)).  This is incorrect.  The Department

14   has conceded that it lacks statutory authority to enforce this position against Miyoko's.

15   Moreover, the cases cited by Miyoko's are easily distinguished.  *Fikre* concerns the withdrawal of

16   a single person from the agency's attention and distinguishes the department-wide policy that was

17   sufficient to dismiss for mootness in *White*.  *See Fikre*, 904 F.3d at 1038–39.  Similarly,

18   *McCormack* concerns an agency statement that it will refrain from prosecution against a single

19   plaintiff.  *McCormack*, 788 F.3d at 1025.  Neither case contains an unambiguous admission by

20   the government that the statute does not authorize the challenged conduct.

21        Here, the Department did not act on the challenged "enforcement position."  It reviewed the

22   position and candidly admitted that the relevant statute does not apply to Miyoko's website.  The

23   case is moot whether the Court applies the standard sufficient for statutes in *Glazing Health* or for

24   agency positions in *White*.  Mootness is jurisdictional and there is no reasonable dispute as to the

25   text of the relevant statutes, the statement in the December 9 Letter (ECF No. 1-1), and the

26   _____

     Department acknowledges that the next statute in the Code, California Food and Agricultural
27   Code Section 38956, prohibits the use of milk-associated terms and images on nondairy product
     containers.  Unlike Section 38955, Section 38956 does not contain a requirement that the director
28   promulgate a regulation.  But it does not apply to Miyoko's website for the same reason that
     Section 38955 does not apply: it concerns the package, not the website.

1   Department's Notice (ECF No. 37).  The court should grant summary judgment on the website

2   claim, dismissing this claim for lack of jurisdiction.

3                                             **CONCLUSION**

4          Miyoko's is a new entrant to a market for non-dairy alternatives to butter.  A shopper who

5   sees a product called "Butter," combined with "Revolutionizing Dairy with Plants" in large print,

6   marketed as "Hormone Free," "Lactose Free," and "Cruelty Free," knowing that non-dairy

7   substitutes have been sold for decades, could misunderstand the label and believe that Miyoko's

8   has changed how dairy products are made by adding plants to a dairy product.  The Court should

9   grant summary judgment to the Department, allowing it to continue its consumer protection

10  regulation.

11

12  Dated:  December 9, 2020                    Respectfully Submitted,

13                                              XAVIER BECERRA
                                                Attorney General of California
14                                              MYUNG J. PARK
                                                Supervising Deputy Attorney General
15
                                                */s/ Michael S. Dorsi*
16                                              MICHAEL S. DORSI
                                                Deputy Attorney General
17                                              *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26

27
    SF2020200476
28  42468847.docx

                                                    16