UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIYOKO'S KITCHEN,

    Plaintiff,

v.

KAREN ROSS, et al.,

    Defendants.

Case No. 20-cv-00893-RS

**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Miyoko's Kitchen ("Miyoko's") is a purveyor of plant-based dairy alternatives. In 2019, the California Department of Food and Agriculture ("Department") notified Miyoko's that the labeling of the company's "vegan butter" product, along with an image on its website, violated state and federal law. Miyoko's brought suit under the First Amendment, challenging the regulatory authority of the State[1] as applied to the company's commercial speech. The parties now bring cross-motions for summary judgment. To a large degree, these motions trade in the same evidence and arguments advanced in connection with Miyoko's motion for preliminary injunctive relief one year ago; and to a large degree, the result at that juncture comports with the one reached here. For the reasons set forth herein, the State's cross-motion is granted with respect to the phrase "hormone free," and otherwise denied; Miyoko's cross-motion is granted with respect to the

---

[1] Represented in this action by defendants Karen Ross and Stephen Beam, in their official capacities within the Department.

phrases "butter," "lactose free," "cruelty free," and "revolutionizing dairy with plants," and otherwise denied; and Miyoko's claim concerning its website is dismissed as moot.

## II. BACKGROUND[2]

### A. Applicable Food Law

California law directs the Department to review food labeling for compliance with federal law, which in turn proscribes the sale of "misbranded" food items (including items with "labeling [that] is false or misleading"), food items "offered for sale under the name of another food," and food items that, though "purport[ing] to be or . . . represented as a food for which a definition and standard of identity" exists, do not "conform[] to such definition and standard[.]" Cal. Food & Agric. Code § 32912.5; 21 U.S.C. § 343. Since 1923, the standard of identity for butter has described a product "made exclusively from milk or cream, or both . . . and containing not less than 80 per centum by weight of milk fat." 21 U.S.C. § 321a.

### B. Miyoko's Commercial Speech

Miyoko's "vegan butter" product is made entirely from plants. Labeling on the front and back of the packaging for this product appears as:



---

[2] In lieu of a fulsome case history, *see* Dkts. 33 (providing one), 46 (same), this order sets out only undisputed facts.

ORDER
CASE NO. 20-cv-00893-RS



*See* Complaint, Dkt. 4-1 at 5. On one side of the same packaging, labeling appears as:

*See id*. Miyoko's website features assorted cow imagery, such as an image of a woman petting a cow accompanied by the phrase "100% dairy and cruelty free."

**C. The Department's Enforcement Activity Toward Miyoko's**

In December 2019, the Department sent Miyoko's a letter stating the company's "vegan butter" gave the misleading (and thus illegal) impression of "a dairy food without [traditional dairy] characteristics." The letter instructed Miyoko's to remove five terms ("butter," "lactose free," "hormone free," "cruelty free," and "revolutionizing dairy with plants") from the product's labeling, and to take down the aforementioned online cow imagery.[3] Significantly, the Department has since renounced any enforcement power for the latter instruction. The State now concedes—

---

[3] The letter objected to this imagery on the grounds that "[d]airy images or associating the product with [agricultural] activities cannot be used on the advertising of products which resemble milk products."

ORDER
CASE NO. 20-cv-00893-RS

3

and Miyoko's does not contest—that "[t]he Department . . . lacks statutory authority" to regulate Miyoko's website.

### D. The Feltz Study

In 2018, Silke Feltz and Adam Feltz authored a research study titled "Consumer Accuracy at Identifying Plant-based and Dairy-based Milk Items" ("Feltz Study"). While not involving any "vegan butter" products, the Feltz Study empirically assesses consumer reactions to traditional milk-based products and corresponding plant-based alternatives that, like Miyoko's "vegan butter," are labeled in a manner combining dairy signifiers (*e.g.*, "cheese" and "milk") with dairy-disclaiming language (*e.g.*, "dairy free"). It indicates, in relevant part, that the public "accurately identifie[s] the source of animal-based milk products 84% of the time, plant-based milk-products 88% of the time, animal-based cheese products 81% of the time, and plant-based cheese products 74% of the time."

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal citations and quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which that party bears the burden of proof at trial. *Id.* at 322-23.

The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the

entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

The trial court "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

**B. Mootness**

Federal courts maintain limited jurisdiction; they only have power to hear disputes when authorized by Article III and by Congress pursuant thereto. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). When a federal court lacks jurisdiction, it must dismiss the case. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003). "A case that becomes moot *at any point* during the proceedings . . . is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S.Ct. 1532, 1537 (2018) (emphasis added). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III— when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

# IV. DISCUSSION

Though styled as seeking summary judgement, the instant cross-motions also present a mootness issue vis-à-vis the Department's withdrawn stance on Miyoko's website. Given this, the discussion below addresses the parties' cross-motions for summary judgment regarding Miyoko's "vegan butter" labeling on the one hand, and the Department's (constructive) 12(b)(1) motion to dismiss for mootness on the other.

**A. Summary Judgment**

Censorship of commercial speech is tested under the *Central Hudson* standard, which first asks whether the restricted speech is "misleading . . . [or] related to unlawful activity[.]" *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 564 (1980). If it is, the First Amendment does not apply; otherwise, the restriction survives only if (1) "the State . . . assert[s] a substantial interest to be achieved by [the] restriction[]," and the restriction both (2) "directly advance[s] the state interest involved" and (3) is "not more extensive than is necessary to serve that interest." *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (internal quotation marks omitted) (citing *Central Hudson*, 447 U.S. at 564-66). The *Central Hudson* burden "is heavy," *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (internal quotation marks omitted), and borne by "the party seeking to uphold . . . [the] restriction on commercial speech," *Edenfield v. Fane,* 507 U.S. 761, 770 (1972) (internal bracketing and quotation marks omitted).

As a general matter, "when parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and bracketing omitted). Here, however, the State makes clear that so far as evidence is concerned, it intends to rely almost exclusively on the Feltz Study—which *also* serves, in the first instance, as Miyoko's leading piece of evidence.[4] *See generally* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52

---

[4] Having commandeered the Feltz Study, the State objects to various other research offered by Miyoko's. *See generally* Defs.' Reply Brief, Dkt. 63 at 9-13. Because these objections are directed

1   (identifying no surveys, studies, or other empirical data beyond the Feltz Study); *see also id.* at 15
2   n.6 (conceding that "the study offered as evidence by Miyoko's is the most thorough analysis of
3   similar products, and therefore the most useful for this case"). Accordingly, consideration of both
4   motions converges on a single question: can the State—equipped with a record consisting of little
5   else than the Feltz Study and reasonable inferences arising therefrom—ultimately satisfy its
6   "heavy" *Central Hudson* burden for restricting Miyoko's use of "butter," "lactose free," "hormone
7   free," "cruelty free," and "revolutionizing dairy with plants"? *See Italian Colors Restaurant,* 878
8   F.3d at 1176 (internal quotation marks omitted). With the exception of "hormone free," it cannot.

### 1. "Hormone Free"

As in its opposition to Miyoko's motion for preliminary injunctive relief, the State points out that Miyoko's "vegan butter" product contains naturally occurring plant hormones; that the product's "hormone free" claim is thus irrefutably false; and that under *Central Hudson*'s threshold prong, the State's authority to censor false commercial speech is not subject to judicial second-guessing. *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985). Tellingly, Miyoko's final answer to these airtight propositions is a plea for a truce: in a reply brief footnote, the company "unilaterally withdraws its challenge to the State's demand . . . [as to] 'hormone free,'" and submits "[the] Court, therefore, need not decide whether summary judgment is warranted on this issue." *See* Pl.'s Reply Brief, Dkt. 64 at 4 n.2. This eleventh-hour gambit to avoid an unfavorable ruling is, for reasons beginning with Federal Rule of Civil Procedure 15, unavailing. The State has moved for summary judgment on the "hormone free" allegations contained in the operative complaint, and as a matter of settled law, it is entitled to judgment that those allegations afford Miyoko's no First Amendment basis for relief. Insofar as the State's cross-motion seeks such judgment, it is granted.[5]

---

at evidence immaterial to the outcome of this order, they are overruled.

[5] Miyoko's, consistent with its *sub silentio* request for leave to retract its "hormone free" claim, does not move for summary judgment around the phrase.

### 2. "Butter"

Fortunately for Miyoko's, the State's censorship authority over the language at issue ends there. Applying *Central Hudson* to "butter," the State insists Miyoko's uses the term in a manner that either misleads consumers or, at the very least, materially frustrates a substantial governmental interest. Neither argument prevails.

#### *i. Threshold* Central Hudson *Inquiry*

For *Central Hudson*'s first prong, the State draws upon the federal definition of "butter" and the Feltz Study.[6] Regarding the first of these authorities, there is no denying that § 312a's dairy and fat-content requirements exclude Miyoko's "vegan butter." Yet as other courts have rightly noted, this alone cannot doom commercial speech at *Central Hudson*'s threshold, lest *Central Hudson* be read to protect only what the government leaves undefined. *See Ocheesee Creamery LLC v. Putnam* ("*Ocheesee*"), 851 F.3d 1228, 1238 (11th Cir. 2017) ("[I]t does not follow that once a state has [defined a term] . . ., any use of the term inconsistent with the state's preferred definition is inherently misleading. Such a per se rule would eviscerate *Central Hudson*, rendering all but the threshold question superfluous.").[7] Wisely, the State declines to advocate this expansively wrong interpretation. Instead, it argues that § 321a in particular deserves a sort of

---

[6] That caselaw does not seriously factor into this endeavor is no surprise. Indeed, called by Miyoko's to confront a growing judicial consensus that the names of plant-based dairy alternatives are not misleading, the State doggedly pretends the relevant cases do not exist. *See* Pl.'s Cross-Mot. for Summary Judgment, Dkt. 60 at 21 ("[A]s it has throughout this litigation, the State just disregards these key cases—it doesn't mention them once in its motion."); *see also Ang v. Whitewave Foods Co.*, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013) ("[T]he names 'soymilk,' 'almond milk,' and 'coconut milk' accurately describe Defendants' products."); *Gitson v. Trader Joe's Company*, 2015 WL 9121232, at *1 (N.D. Cal. Dec. 1, 2015) ("The reasonable consumer (indeed, even the least sophisticated consumer) does not think soymilk comes from a cow."); *Turtle Island Foods SPC v. Soman*, 424 F.Supp.3d 552, 574 (E.D. Ark. 2019) ("It is true, as the State contends, that these labels use some words traditionally associated with animal-based meat. However, the simple use of a word frequently used in relation to animal-based meats does not make use of that word in a different context inherently misleading.").

[7] The *Ocheesee* case, despite its prominence in both the preliminary injunction order and Miyoko's cross-motion, also goes unmentioned in the State's briefing.

constitutional credit for old age: because the statute has been on the books for ninety-odd years, it must be especially reflective of what consumers understand "butter" to mean. This logic, which finds no footing in the State's cited authorities, defies common sense. Quite simply, language evolves. Absent anything from the State revealing why old federal food definitions are more faithful indicators of present-day linguistic norms, neither the fact nor the vintage of the federal definition of "butter" counts against Miyoko's at *Central Hudson*'s first step.

So too for the Feltz Study. To reiterate, the Feltz Study—first introduced by Miyoko's at the preliminary injunction stage, to prove that dairy alternatives do *not* generate meaningful consumer confusion—suggests four salient consumer misidentification rates: (i) 16% for traditional milk products; (ii) 12% for plant-based milk products; (iii) 19% for traditional cheese products; and (iv) 26% for plant-based cheese products. Unquestionably, the latter (and largest) of these figures serves as solid evidence that when a dairy-alternative food product is labeled, like Miyoko's "vegan butter," with both "the name of a dairy product and . . . dairy-associated statements," that labeling tends to confuse 26% of consumers. *See* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52 at 15. As explained at the preliminary injunction stage, though, the State's relentless focus on this lone datum misses the forest for the trees:

> Hoping to turn [the Feltz Study] against its proponent, the State makes hay of the 74% [plant-based cheese product identification] figure—or, more accurately, of the 26% consumer-confusion rate it necessarily describes. This is, to put it mildly, a blinkered interpretation. Adopting the State's preferred metric, 26% of the study's participants were indeed confused by plant-based cheeses—but a full 19% were also confused by animal-based cheeses. Conversely, while 12% of respondents misidentified plant-based milks, 16% misidentified animal-based milks. Taken as a whole, this research merely signals the following: that consumers are perhaps a bit better at identifying traditional cheeses than vegan cheeses, and perhaps a (roughly equivalent) bit better at identifying vegan milks than traditional milks. For the purposes of First Amendment scrutiny, this modest takeaway hardly cuts in favor of finding Miyoko's use of "butter" inherently misleading.

Preliminary Injunction Order, Dkt. 46 at 9. Put briefly, this conclusion holds up at summary

judgment.[8] Just like § 312a does not make "butter" per se misleading in all § 312a-noncompliant circumstances, the Feltz Study does not do so in the more specific context of labeling akin to Miyoko's. On the record as the State has left it, Miyoko's use of "butter" is constitutionally protected.

### *ii. Remaining* Central Hudson *Factors*

Nor has the State met its burden for overriding that protection. Under the intermediate scrutiny of *Central Hudson*'s remaining factors, the State's "butter" ban against Miyoko's obliges it to proffer a substantial interest, and to show the ban advances that interest in a proportionally reasonable fashion. *See Edenfield,* 507 U.S. at 767. Relevant here, in the setting of an as-applied challenge,[9] this advancement cannot be "ineffective or remote"; for the restriction to stand, the State "must demonstrate that the harms it recites are real and that its restriction will *in fact* alleviate them to a material degree." *Id.* at 770-71 (emphasis added).

The State attempts to make this showing on two equally unpersuasive levels. The first is explicit: pointing to an interest in "avoid[ing] customer confusion," the State contends it must censor Miyoko's to prevent "customers intending to purchase butter . . . [from] leav[ing] the store with something else." *See* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52 at 17. This argument, which rephrases the State's threshold *Central Hudson* theory using naked speculation in

---

[8] Perhaps anticipating as much, the State spends one paragraph giving its recycled Feltz Study argument a fresh gloss: trademark law. Because "the Lanham Act is constitutional," and because a handful of federal trademark plaintiffs have secured injunctions with "survey results where 15% of customers" expressed confusion between marks, the State intimates that there is precedent for assigning strong First Amendment significance to the Feltz Study's 26% plant-based cheese product misidentification rate. *See generally* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52 at 16. There is not. By the State's reply brief, the notion of a trademark-derived 15% consumer confusion threshold for censoring commercial speech—which, going off the Feltz Study, would bode ill for "milk" and "cheese" when used to market *dairy* products—is nowhere to be found.

[9] This case has been litigated and adjudicated on an as-applied basis. Miyoko's seeks the narrowest relief available on this set of facts (*i.e.*, judgment shielding the company from the Department's discrete enforcement position), and does not attack the facial validity of any generally applicable law.

ORDER
CASE NO. 20-cv-00893-RS

place of the Feltz Study, fares no better the second time around. *See generally supra* Part IV.A.2(i). As for the State's other intermediate scrutiny effort, it is not so much an argument as a sleight-of-hand. In expounding the need to prevent Miyoko's supposed marketplace harm, the State slips another interest through the cracks: upholding a "consistent scheme" for the regulation of food labeling. *See* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52 at 17; *see also id.* at 18 ("Given the volume of applications and the interest in fair competition, the Department's approach is the best way to apply a consistent rule to all products[.]").

The defect in this tactic is plain. By furtively invoking (but never outright asserting) the need for uniform regulation—an interest which, by its terms, exists at the highest level of generality—the State in essence insinuates it should not be held to demonstrating consumer confusion specifically attributable to Miyoko's "vegan butter." This, of course, is not the law. Concern over the "abolition of standards of identity for foods" notwithstanding, *see id.* at 19, the First Amendment demands proof that restricting Miyoko's commercial speech will promote the State's *asserted* interest. *See Edenfield*, 507 U.S. at 768 ("[T]he *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions. Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction.") (citation omitted). Here, the State's sole asserted interest is "avoid[ing] consumer confusion." Because the record lacks material reasonably supporting the conclusion that removing "butter" from Miyoko's labeling "will in fact" advance that interest "to a material degree," the State may not enforce any order to that effect. *See id.* at 771. To the extent it seeks judgment that the State cannot carry its *Central Hudson* burden concerning "butter" as it appears on Miyoko's "vegan butter" product, Miyoko's cross-motion is granted; to the extent it seeks judgment to the contrary, the State's cross-motion is denied.

### 3. "Lactose Free," "Cruelty Free", and ""Revolutionizing Dairy With Plants"

Resting once again on the Feltz Study, the State provides no additional evidence for its authority to regulate "lactose free" and "cruelty free" on Miyoko's labeling. *See* Defs.' Reply Brief, Dkt. 63 at 8 n.3 ("The Court should reach the . . . conclusion [that] 'Lactose Free' and

'Cruelty Free' [are misleading] because the same evidence of confusion for 'Butter,' the . . . Feltz survey, tested a package with similar phrasing."). Once again, "this strategy asks more of '26%' than the figure can bear," depriving the record of adequate support for a finding that the terms are either misleading or frustrative of a stated governmental interest. *See* Preliminary Injunction Order, Dkt. 46 at 12. The record is likewise deficient as to the State's regulatory authority over "revolutionizing dairy with plants"—a reality that, with the benefit of Miyoko's more extensive post-preliminary injunction briefing of the issue, the State astutely concedes. *See* Defs.' Reply Brief, Dkt. 63 at 15. (Acknowledging that because "'Revolutionizing Dairy With Plants' is not misleading . . . the Court [should] grant[] summary judgment to Plaintiff on this point."). Miyoko's cross-motion is consequently granted as to "lactose free," "cruelty free," and "revolutionizing dairy with plants." The corresponding portion of the State's cross-motion is denied.

### B. Mootness

The State's withdrawal of its enforcement position regarding cow imagery on Miyoko's website implicates the voluntary cessation exception to mootness. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."). As the party asserting mootness, the State bears the "heavy burden of proving that the challenged conduct cannot reasonably be expected to recur[.]" *See Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (internal quotation marks omitted).

The State clears that hurdle here. Shortly after this action began, the Department determined its initial assertion of authority to regulate Miyoko's website had relied upon a statute that does not confer the Department that power. *See* Withdrawal of Position, Dkt. 37 ("[The] position stated in the December [2019] letter . . . is inconsistent with the relevant statute[.]"). Since then, the State has elaborated that *no* statute confers that power. *See* Defs.' Cross-Mot. for Summary Judgment, Dkt. 52 at 21 ("The Department . . . lacks statutory authority to enforce this position against Miyoko's."). Rather than contesting the truthfulness of this admission, Miyoko's argues it must be further crystallized—through, for instance, a regulation affirmatively placing

websites beyond the Department's purview—before the issue is moot. Bearing in mind the presumption of good faith applicable to "the voluntary cessation of challenged conduct by government officials," Miyoko's oversells the State's burden. *See Board of Trustees of Glazing Health and Welfare Trust v. Chambers,* 941 F.3d 1195, 1198 (9th Cir. 2019). The State has represented, unambiguously and in federal court, that restricting speech on Miyoko's website would be an *ultra vires* act by the Department; and Miyoko's has not put forward evidence of a forthcoming disturbance of this status quo. Together, these circumstances make it exceedingly unlikely the Department will reprise its threat targeting Miyoko's digital speech. The issue involving cow imagery on Miyoko's website is therefore moot.

## V. CONCLUSION

Consistent with the foregoing, the State's cross-motion is granted insofar as it seeks judgment that Miyoko's use of "hormone free" on the company's "vegan butter" product labeling is not constitutionally protected commercial speech, and denied in all other respects; Miyoko's cross motion is granted insofar as it seeks judgment that the State may not restrict Miyoko's use of "butter," "lactose free," "cruelty free," and "revolutionizing dairy with plants" on the company's "vegan butter" product labeling, and denied in all other respects; and Miyoko's claim relating to the contents of its website is dismissed as moot. The parties shall file a Joint Status Report, detailing the remaining issues in this case, if any, no later than September 2, 2021. Alternatively, if the parties conclude that this order resolves all remaining issues, they shall file by that date a proposed form of judgment.

**IT IS SO ORDERED**.

Dated: August 10, 2021

_____
RICHARD SEEBORG
Chief United States District Judge